DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Lenore Collins, seeks a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to specifically state the evidence upon which it relied when it terminated relator's permanent total disability ("PTD") award. Alternatively, relator seeks a writ of mandamus ordering the commission to reinstate relator's PTD benefits.
 {¶ 2} Pursuant to Civ. R. 53(C) and Loc. R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate recommended denial of relator's request for a writ of mandamus.
 {¶ 3} Relator has filed objections to the magistrate's decision. In her objections, relator asserts the magistrate erred when he concluded that: (1) there was some evidence in the record to support a finding that relator is capable of sustained remunerative employment; (2) the commission did not abuse its discretion when it denied relator's request to subpoena witnesses; and (3) the commission did not err when it failed to conduct a hearing pursuant to relator's motion of January 3, 2002 [sic].[1] Relator's objections essentially reassert arguments that she made before the magistrate.
 {¶ 4} For a writ of mandamus to lie, "a court must find that: (1) the relator has a clear legal right to the relief requested; (2) the respondent is under a clear legal duty to perform the act sought; and (3) the relator has no plain and adequate remedy at law." State ex rel. OscoIndus. v. Indus. Comm. of Ohio (1989), 43 Ohio St.3d 167, 168, citingState ex rel. Westchester Estates, Inc. v. Bacon (1980), 61 Ohio St.2d 42, paragraph one of the syllabus.
 {¶ 5} Only upon a showing of an abuse of discretion is a commission's order subject to correction in mandamus. Osco Indus., at 168, citingState ex rel. Allied Wheel Products, Inc. v. Indus. Comm. (1956),166 Ohio St. 47. "Where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus will not lie." State ex rel. Kroger Co. v. Stover (1987),31 Ohio St.3d 229, 232. Determination of the weight and credibility of evidence belongs to the commission alone. State ex rel. Baker v. Indus.Comm., 97 Ohio St.3d 267, 2002-Ohio-6341, at ¶ 6, citing State ex rel.Burley v. Coil Packing, Inc. (1987), 31 Ohio St.3d 18, 20-21.
 {¶ 6} In her first objection, relator asserts the magistrate erred when he concluded that there was some evidence to support a finding that relator is capable of sustained remunerative employment.
 {¶ 7} A claimant's capacity for any sustained remunerative work is the relevant issue in a PTD determination. State ex rel. Lopez v. Indus.Comm. (1994), 69 Ohio St.3d 445, 449; State ex rel. Domjancic v. Indus.Comm. (1994), 69 Ohio St.3d 693, 695. "The character of a permanent total disability award does not, however, mean that the award is completely immune from later review. If, for example, the commission learns that the claimant is working or engaging in activity inconsistent with his permanent total disability status, the commission can use its continuing jurisdiction under R.C. 4123.52 to reopen the matter." State ex rel.Smothers v. Mihm (1994), 69 Ohio St.3d 566, 567-568. "Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, (2) the physical ability to do sustained remunerative employment, or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award." State ex rel. Lawson v. Mondie Forge, 104 Ohio St.3d 39,2004-Ohio-6086, at ¶ 16 (citations omitted). See, also, State ex rel.Koonce v. Indus. Comm. (1985), 18 Ohio St.3d 60, 63 (observing that the commission must have before it reliable, probative, and substantial evidence before it can terminate an award of permanent total disability).
 {¶ 8} Here, the report of the Ohio Bureau of Workers' Compensation Special Investigations Unit that described relator's babysitting activities, which the staff hearing officer ("SHO") found persuasive, constitutes some evidence to support the SHO's finding that relator had actually engaged in sustained remunerative work and, by implication, that relator had a capacity for sustained remunerative work. See State exrel. Kirby v. Indus. Comm., 97 Ohio St.3d 427, 2002-Ohio-6668, at ¶ 10
(observing that "[State ex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27,2002-Ohio-3316, reconsideration denied 96 Ohio St.3d 1489, 2002-Ohio-4478] held that evidence of even irregular employment can support the presumption that claimant is indeed either doing — or is capable of doing — sustained remunerative employment"); State ex rel. Roberts v. Indus.Comm. (1984), 10 Ohio St.3d 1, 5 (observing that "[b]y its unequivocal terms, R.C. 4123.10 grants the commission considerable discretion regarding the evidence which it considers").
 {¶ 9} Furthermore, it was within the province of the SHO to determine the credibility and weight to be given to relator's evidence that she did not engage in babysitting activities on a sustained basis for remuneration and that funds in a checking account reflected income that her husband received for an out-of-home business. See Baker, supra, at ¶ 6 (observing that determination of the weight and credibility of evidence belongs to the commission).
 {¶ 10} Accordingly, relator's objection that the magistrate erred when he concluded that there was some evidence in the record to support a finding that relator is capable of sustained remunerative employment is not persuasive.
 {¶ 11} Relator's second objection asserts the magistrate erred when he found the commission did not abuse its discretion when it denied relator's request to subpoena witnesses.
 {¶ 12} Relator first requested the commission to subpoena witnesses when she moved the commission to reconsider the SHO's order. (Stip.R. Ex. 6.) Relator also requested the commission to subpoena witnesses in subsequent correspondence with the commission. (Stip.R. Ex. 12, 14).
 {¶ 13} R.C. 4123.08 provides, as follows:
Each member of the industrial commission, and its deputies, supervisors, directors, and secretaries, appointed by the commission, and employees of the bureau of workers' compensation designated by the administrator of workers' compensation, may for the purposes contemplated by this chapter, administer oaths, certify to official acts, take testimony or depositions, conduct hearings, inquiries, and investigations, issue subpoenas, and compel the attendance of witnesses and the production of books, accounts, papers, records, documents, evidence, and testimony.
(Emphasis added.) Cf. R.C. 4121.15 (providing that the administrator of workers' compensation and designees may issue subpoenas). Because R.C. 4123.08 provides that the commission may issue subpoenas, we conclude that the commission's authority to issue subpoenas is permissive and thus discretionary.
 {¶ 14} Based upon the facts and circumstances of this case, we cannot conclude that the commission abused its discretion when it denied relator's requests to issue subpoenas. Assuming arguendo that relator's proposed witnesses refused to testify at the hearing before the SHO, relator conceivably could have requested the SHO to issue subpoenas to compel the proposed witnesses to appear. However, prior to the hearing before the SHO, there is no evidence that relator requested the SHO to issue subpoenas.
 {¶ 15} Furthermore, relator's requests for the issuance of subpoenas were made after the administrative hearing before the SHO. Because relator failed to take active steps to obtain live witness testimony at the hearing before the SHO, we cannot conclude that, under these circumstances, the commission acted unreasonably, arbitrarily or unconscionably when it denied relator's post-hearing requests to issue subpoenas. See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219
(stating that "`[t]he term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable * * *'") (citations omitted); see, also, Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87, quoting State v. Jenkins (1984), 15 Ohio St.3d 164, certiorari denied (1985), 472 U.S. 1032, 105 S.Ct. 3514, rehearing denied, 473 U.S. 927,106 S.Ct. 19 (instructing that to have an abuse of discretion "`the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias'").
 {¶ 16} Accordingly, relator's second objection is not persuasive.
 {¶ 17} In her third objection, relator asserts the magistrate erred when he found that the commission did not err when it failed to conduct a hearing pursuant to relator's motion of January 2, 2002.
 {¶ 18} On January 2, 2002, relator moved the commission to "invoke its continuing jurisdiction to correct both a clear mistake of fact, as well as a mistake of law by making a finding that Ms. Collins was paid for her babysitting as stated in the Industrial Commission order dated September 1, 2001." (Stip.R. Ex. 11.) In this same motion, relator also "request[ed] that as [the SHO's] order was based on a clear mistake of fact as well as an improper application of law regarding the burden of proof for fraud that the entire order be vacated and a new hearing be scheduled on the issue of permanent total disability." Id. With this motion, relator also filed affidavits in support of her motion.
 {¶ 19} The commission's continuing jurisdiction pursuant to R.C. 4123.52
is not unlimited. State ex rel. Nichols v. Indus. Comm. (1998),81 Ohio St.3d 454, 458-459. "Its prerequisites are (1) new and changed circumstances, (2) fraud, (3) clear mistake of fact, (4) clear mistake of law, or (5) error by an inferior tribunal." Id. at 459.
 {¶ 20} Notwithstanding relator's claims, based upon our review, we find the affidavits that relator filed in support of her January 2, 2002 motion do not evidence new and changed circumstances, nor do these affidavits support a finding of a clear mistake of fact or a clear mistake of law. Rather, these affidavits constitute cumulative evidence and merely corroborate relator's claims that the SHO found unpersuasive. Additionally, based upon our review, we cannot conclude the commission improperly shifted the burden of proof for determining fraud as relator contended in her motion of January 2, 2002.
 {¶ 21} Accordingly, relator's third objection is not persuasive.
 {¶ 22} For the foregoing reasons, we find that the magistrate has properly discerned the pertinent facts and applied the relevant law to those facts. Accordingly, we overrule relator's objections. We also adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it with the sole exception that the magistrate's finding of fact No. 26 shall be modified to reflect that relator's motion was filed on January 2, not January 3, 2002. Accordingly, we deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
Lazarus, P.J., and Brown, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. : Lenore Collins, : Relator, : v. : No. 04AP-31 Industrial Commission of Ohio : (REGULAR CALENDAR) and Great Lakes Carbon Corp., : Respondents. :
 MAGISTRATE'S DECISION Rendered on July 21, 2004 Law Offices of Thomas Tootle, and Thomas Tootle, for relator.
Jim Petro, Attorney General, and Stephen D. Plymale, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 23} In this original action, relator, Lenore Collins, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the August 29, 2001 order of its staff hearing officer terminating relator's award of permanent total disability ("PTD") compensation and declaring an overpayment of said compensation based upon a finding of fraud, and to enter a new order that determines whether relator is capable of sustained remunerative employment. In the alternative, relator requests that the writ order the commission to vacate its order denying relator's January 3, 2002 motion for the exercise of continuing jurisdiction over the August 29, 2001 order, and to enter an order that schedules the motion for hearing.
 {¶ 24} Findings of Fact:
 {¶ 25} 1. On October 17, 1977, relator sustained an industrial injury which is allowed for: "lumbosacral sprain with radiation to left leg, lumbosacral disc disease," and is assigned claim number 77-32943. The industrial claim is a state-fund claim.
 {¶ 26} 2. On January 2, 1996, relator filed an application for PTD compensation. Following an August 6, 1996 hearing, a staff hearing officer ("SHO") issued an order granting the application and awarding PTD compensation starting October 24, 1995.
 {¶ 27} 3. On May 3, 2001, the Ohio Bureau of Workers' Compensation ("bureau") moved the commission for termination of the PTD award and for declaration of an overpayment of compensation beginning November 1, 1996, based upon the bureau's allegation that the compensation was fraudulently obtained. In support of the motion, the bureau submitted an investigative report from its Mansfield Special Investigations Unit ("SIU").
 {¶ 28} 4. Based upon an unidentified allegation that relator was baby-sitting while receiving PTD compensation, SIU began surveillance of relator's residence located in Marion, Ohio, beginning August 11, 1998. On that date, during the early morning surveillance, SIU observed three different vehicles arrive at the residence and depart a short time later. Two children carrying book bags were observed exiting one vehicle and entering the residence. A blond female exited another vehicle and carried a small child into the residence. The other vehicle was positioned so that SIU was unable to observe whether children were being dropped off. Photographs were taken by SIU and the owners of the three vehicle were identified.
 {¶ 29} 5. On September 2, 1998, the second early morning surveillance was conducted by SIU. That morning, SIU observed five vehicles arriving at relator's residence. The driver of the first vehicle took a small child to the house and left without the child. The second and third vehicles to arrive were positioned so that SIU was unable to observe whether children were being dropped off. A female exited the fourth vehicle to arrive and was observed taking two small children into relator's residence. SIU observed relator holding the door open for the children to enter. The fifth vehicle to arrive was positioned so that SIU was unable to observe whether children were being dropped off.
 {¶ 30} 6. On October 9, 1998, SIU received subpoenaed bank account information from relator's bank. SIU discovered that during a two year period there were over $18,600 in cash deposits for this account. There were numerous personal checks made payable to relator's husband and there were numerous personal checks made payable to relator. The SIU investigative report identified 13 personal checks made payable to relator that were endorsed by relator. There was a personal check from Karen Rubendall, dated November 1, 1996, in the amount of $191 that relator endorsed. Rubendall issued another personal check to relator, dated November 15, 1996, in the amount of $139. There were also personal checks made payable to relator from Jennifer S. Johnson, Deana L. Persinger, Tami J. Potts, Dale Gray, and Chad and Mistii Zimmerman. The amounts payable on those checks ranged from $15 to $100.
 {¶ 31} 7. SIU conducted its third early morning surveillance of relator's residence on September 29, 1999. SIU observed two vehicles arrive at the residence, but the vehicles were positioned so that SIU was unable to observe whether children were being dropped off. Early morning surveillances were also conducted on October 25 and November 1, 1999.
 {¶ 32} 8. On November 2, 1999, SIU conducted an afternoon surveillance of relator's residence. SIU observed a vehicle arrive at the residence and depart six minutes later. Another vehicle arrived and an adult male exited the vehicle. Relator and a small child met the male at the front door and the male left with the child.
 {¶ 33} 9. On November 16, 1999, SIU conducted another afternoon surveillance of relator's residence. Two vehicles were observed arriving at the residence. An adult male exited one of the vehicles and relator met this male at the front door with two small children. The male took one of the children and departed. The other vehicle was observed arriving at the residence and departing five minutes later. At least one child was observed in the vehicle as it left relator's residence.
 {¶ 34} 10. On November 23, 1999, SIU conducted another afternoon surveillance of relator's residence. Four vehicles were observed arriving at the residence and departing a short time later. SIU observed one child entering one of the vehicles. SIU observed two small children entering another vehicle. Another vehicle was positioned so that SIU was unable to observe whether children were being picked-up.
 {¶ 35} 11. On February 8, 2000, SIU agents Kish and McCloskey arrived at relator's residence to conduct an unscheduled interview. Afterwards, agent Kish filed the following report of his interview with relator:
She confirmed that she is currently receiving permanent total disability benefits by automatic deposit into her bank account.
I then explained that I wanted to go over some forms that I had photocopied out of her claim file. Collins put her eyeglasses on so that she could read the forms. I first showed her the application for permanent total disability that she had completed and signed on November 18, 1990. I told her that I would like to verify that the information on the form is correct. I also asked her if she remembered reading the paragraph that states that she is required to inform the BWC if she is able to return to work. She advised that she did. She took approximately one minute to read and look over the application before telling me that the information looked correct. She also advised that it was her signature on the form.
I then showed Collins the application for permanent total disability that she had completed and signed on June 22, 1988. As she looked at this application, I asked her if she knew that she was not allowed to work while receiving permanent total disability benefits. She said that she did. I asked her how she knew this. She stated that because she had dealt with the BWC for so long, she just knew it. She also admitted that her attorney had advised her of this. She again confirmed that the signature was hers and that the information looked correct.
I then said that another way that she probably knew that she was not entitled to work while receiving permanent total disability benefits was from the warning on the back of the checks that we had previously paid to her. At this point I showed her an enlarged photocopy of the back of one of the BWC warrants that she had signed. She confirmed that the signature was hers and that she was aware of the warning paragraph.
Next, I showed Collins the three letters that the BWC mailed to her, dated November 25, 1997, November 25, 1998, and November 18, 1999. Collins stated that the signatures on the forms were hers and she remembers receiving them. She said that she knew that the purpose of these were to make sure that we had the correct information.
I then showed Collins the application for permanent total disability benefits that she signed on December 29, 1995. Collins examined the form and advised that her niece had helped her fill out the form, and the writing was that of her niece. Collins admitted to reading the application and also stated that her niece had read it and explained it to her because it was easier than traveling to Columbus where her attorneys were located. Collins stated that the information on the form looks correct and agreed that the information put down on the application by her niece came from Collins herself.
At this point I told Collins that I had to ask her if she had worked at all while receiving permanent total disability. She advised that she had not. I asked her if she had done any baby[-]sitting for anyone. She advised that she had for her sister, and that the two children sitting with us were her nieces. I asked her if there would be any reason that anyone would say that she was baby[-]sitting for other individuals. She stated that she has helped friends out on occasion before. She denied baby[-]sitting regularly for anyone though. I asked her for the names of the friends that she had done baby[-]sitting for. She then admitted that one of the two children sitting with us belonged to "Misti[i]." I asked her if Misti[i]'s last name was Zimmerman and she said that it was. I then read off the names of Frances Burge, George Smith, and Gayle Alspa[ugh] and asked her if she knew these individuals. She stated that she did. I then asked her if she had been paid by any of the individuals for baby[-]sitting their children. She denied this. I then asked if any of these individuals had written her checks for anything. She stated that they had not.
 {¶ 36} 12. On March 21, 2000, agents Kish and McCloskey interviewed Chad Zimmerman whose vehicles had been observed at relator's residence during the surveillances. Agent Kish filed the following report:
I explained to Zimmerman that we were there in regards to Collins' alleged baby[-]sitting activities. Zimmerman told us that Collins has been baby[-]sitting his daughter, Peyton, for approximately the last year and one half. He estimated the number of hours that Collins watched his daughter at ten to twenty per week, for which they paid her approximately $1.50 per hour. He said that they have paid by cash and by check. During the last month and a half, Collins has only watched their daughter an average of about eight hours per week because the Zimmerman's only needed her for this amount of time.
Zimmerman explained that both he and his wife will drop off or pick up their child at the Collin's [sic] residence, depending on who is available.
 {¶ 37} 13. On March 21, 2000, agents Kish and McCloskey arrived at the residence of Kim Bilotta whose mother is Karen Rubendall. Agents Kish and McCloskey knew that Karen Rubendall had written personal checks to relator during the period of her receipt of PTD compensation. Agent Kish filed the following report:
Bilotta did not immediately recognize Collins' name and therefore did not initially know the reason that her mother had written Collins checks. I showed Bilotta one of the checks that her mother had written, and upon seeing that it was dated in 1996, stated that it probably was for child care. She said that during that time her mother was taking care of her two children while she took care of some other issues. Bilotta then paged her mother (Rubendall), who is currently in Hawaii on a business trip. A short time later, Rubendall called and Bilotta briefly explained to her the situation. I was then given the phone to talk directly to Rubendall.
Although it had been over three years since she had taken the children to Collins, Rubendall was able to confirm that the checks that she had written to Collins were for the care of Bilotta's two children. Rubendall stated that she thought that she paid her every week, but there may have been a time in which she missed a week and then made up for it on the next check. Rubendall stated that she thought that she only paid by check, but could not remember the rate at which she paid Collins. She stated that Collins would watch the two children all day while Rubendall was at work. She said that this went on for approximately two or three months. * * *
After hanging up the phone, Bilotta stated that she now recognized Collins name. Bilotta stated that Collins did baby[-]sit her two children, for approximately six months. Bilotta said that she always paid by cash, and that Collins had a lot of children there at that time. * * *
 {¶ 38} 14. The bureau's May 3, 2001 motion was heard by an SHO on August 29, 2001. Relator was represented by counsel at the hearing. Relator's husband and two other witnesses appeared on relator's behalf.
 {¶ 39} 15. At the August 29, 2001 hearing, relator's affidavit, executed August 25, 2001, was submitted. Relator's affidavit states:
* * * Affiant states that she was granted permanent total disability on August 6, 1996, and that she has absolutely not worked in any capacity since that time. Affiant states further, that she has read the report by the Bureau of Workers' Compensation dated May 3, 2001, and emphatically denies the majority of the allegations therein.
Affiant does admit that on occasion [s]he baby[-]sits for members of her family as well as occasionally for some of her friends and neighbors. However, Affiant states that at no time has she ever been paid for these services, as she is simply doing this as a favor, or in the case of her family, she simply enjoys spending time with her grandchildren, nieces and nephews. Affiant does admit that on occasion she is reimbursed for expenses such as gas money, lunch money or money for basic necessities such as diapers.
Specifically addressing the BWC Motion dated May 3, 2001, Affiant states that she did baby[-]sit for Ryan Johnson, who is the son of my brother, Randy Johnson. However, she was simply doing this as a favor and was never paid for this help.
Affiant also baby[-]sat for her niece, Hannah Alspaugh, who is the daughter of Ga[y]le Alspaugh. Once again, Affiant states that she was not paid anything for this help.
Affiant states further that she also helped out Mr. and Mrs. George Smith by picking up their children at the bus stop and taking them home. Once again, Affiant states that these were friends of hers that she was helping out. Affiant states that she was reimbursed approximately $5.00 per week for gas.
Affiant states that she also baby[-]sat for the daughter of Kim Bilotta on occasion. Affiant states that at the time, Ms. Bilotta was dating her son, Shayne [sic] Patrick. Affiant states that she was only reimbursed for expenses. On one particular occasion, in November of 1996, when Shayne [sic] and Kim were in a fight, Kim left the children (which are from a different marriage) at her house all weekend. However, this was not something I expected or had anticipated and I tried to get a hold of her on many occasions to see when she would be picking them up. As I was forced to care for them for an entire weekend, there were a number of expenses including some new clothing, which I thought was necessary, due to the fact that Kim did not bring anything for her children. Affiant states that as best that she can remember, Kim's mother, Karen Rubendall, eventually reimbursed her for the above-mentioned expenses.
Affiant states that she also baby[-]sat for Andy Scott, the child of Christopher and Sadie Scott. Once again, Andy is my niece and I did it as a favor. At no time have I been paid or even reimbursed for this help.
Affiant states that she read the interview of Chad Zimmerman of March 22, 2000. Affiant states that she did in fact baby[-]sit for Peyton, who is the daughter of Chad and Misty [sic] Zimmerman. Affiant states that she was not however paid for this baby[-]sitting. It was not on a regular basis and when it occurred I was usually only paid $10.00 to $15.00 per week to reimburse me for expenses.
Affiant states that she does not believe she has ever babysat for a Diana [sic] Persinger, Tammy [sic] Potts, Gayle Gray, Francis Burge, although after speaking with her husband, she believes that he may have done some bodywork for them.
 {¶ 40} 16. At the August 29, 2001 hearing, the affidavit of relator's husband, Darrell Collins, executed August 25, 2001, was submitted. The affidavit of Darrell Collins states:
* * * Affiant states that on occasion his wife baby[-]sits for different members of our families as well [as] occasionally for friends and neighbors. However, Affiant states that she was not paid for these services other than to be reimbursed for the necessary expenses.
Affiant states that his current occupation is Auto Body Technician and his primary place of employment is Combs Collision. However, Affiant states that in addition to his job at Combs Collision, he also performs bodywork at home out of his garage. This work out of his garage is done on a sustained basis.
Affiant states that in his bodywork business, he does not accept credit cards and is always paid in either cash or by check. Affiant states that due to the fact that he does not get home from work until approximately 9:00 p.m. that it is difficult for him to deposit the checks from his bodywork business at the bank. Therefore, Affiant states that he often asks his customers to make the checks out to his wife so that she may cash them during normal working hours.
Affiant states that he has read the Motion by the Bureau of Workers' Compensation dated May 3, 2001 and states that in particular he remembers doing bodywork for his brotherin-law, Randy Johnson as well as for Tammy [sic] Potts, Dale Gray, Chad Zimmerman, Gail [sic] Alspaugh, and Christopher and Sadie Scott. Affiant states that he may have also done bodywork for Deanna [sic] Persinger, but he cannot remember for certain. Affiant states that he discussed this with his wife and neither of them can remember exactly why she would have written a check to them. Affiant states that it is also possible that this check may have come as a result of a yard sale they had in the summer of 1997.
 {¶ 41} 17. Following the August 29, 2001 hearing, the SHO issued the following order on September 1, 2001:
Pursuant to the Commission's continuing jurisdiction under O.R.C. 4123.52, this claim is being reheard on the issue of permanent total disability. The motion/notice of referral filed by the Administrator on 5-3-01 is GRANTED, as is consistent with this order.
CONCLUSIONS OF LAW:
Pursuant to O.R.C. Section 4123.59(A), once a claimant has been found to be permanently and totally disabled, "the employee shall receive an award to continue until her death." Once determining that permanent total disability exists the Commission must have before it reliable, probative and substantial evidence before it can terminate an award made pursuant to its original findings. Koonce v. Industrial Commission (1985),18 O.S. 3d 60. What is necessary in order for the Commission to re-examine a permanent total disability award is the emergence of new and changed circumstances since the initial award, which can trigger the Commission's exercise of continuing jurisdiction. B C Machine Co. v. IndustrialCommission (1992), 65 O.S. 3d 538. If, for example, the Commission learns the claimant is working or engaging in activity inconsistent with his permanent total disability status, the Commission can use it's [sic] continuing jurisdiction under O.R.C. 4123.52 to reopen the matter.Smothers v. Mihm (19[9]4), 69 O.S. 3d 566. Per State ex rel. Grimm v.Industrial Commission, unreported (10th Dist. Ct. Appeals), No. 96APD04-419, it is not necessary to obtain new medical evidence to terminate permanent total disability when evidence shows the claimant is engaged in sustained remunerative employment or his physical activities are consistent with sustained remunerative employment.
SPECIAL FINDINGS:
For the reasons that follow, the Staff Hearing Officer finds that there is an overpayment for any and all permanent and total disability compensation paid to the claimant for the period of 11-1-96 onward. In addition, an overpayment is declared for any and all [Disabled Workers Relief Fund] compensation paid to the claimant during the same above period. In addition, the payment of permanent and total disability compensation is terminated in this claim effective on 11-1-96. Finally, it is the finding of the Staff Hearing Officer that the claimant engaged in fraud while collecting permanent and total disability compensation for the period of 11-1-96 onward. This claim file is ordered returned to the BWC location 09/80/00 upon the issuance of this order.
It is the finding of the Staff Hearing Officer that the claimant was engaged in work activity inconsistent with the receipt of permanent and total disability compensation for the period of 11-1-96 onward.
Further, the Staff Hearing Officer orders that any resulting overpayment of permanent and total disability compensation is to be collected pursuant to the fraud provisions of Ohio Revised Code Section 4123. 511(J). Overpayment of the DWRF compensation is to be collected pursuant to applicable BWC rules and regulations.
The requirements that need to be met in order to satisfy a finding of fraud are set forth in MEMO No. U.3 of the Statewide Hearing Officer's Manual, Policy Statements and Guidelines. The prima facie elements of fraud which must be established are: 1) a representation, or where there is a duty to disclose, concealment of fact; 2) which is material to the transaction at hand; 3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury approximately caused by the reliance.
For the reasons that follow, the Staff Hearing Officer finds that each of the above requirements has been met so as to establish a finding of fraud.
First, the Staff Hearing Officer finds that the claimant did commit representations of fact, or concealment of fact, when the claimant had a duty to disclose the concealed fact. Namely, the claimant had been engaged in sustained remunerative employment as a self-employed baby-sitter at her home for the period of at least 11-1-96 onward. She was paid on 11-1-96 by check for performing baby-sitting services for Karen Rubendall and for Jennifer Johnson. She subsequently was paid by check and in cash by the above individuals as well as numerous other individuals (Chad Zimmerman, George Smith, Kim Bilotta, Kristofor [sic] Scott, and others) for baby-sitting services performed by the claimant. The supporting documentation for the above findings is contained in the attachments to the 5-4-01 BWC Special Investigations Unit report in file. Those attachments also demonstrate that the claimant mislead [sic] the BWC on several occasions while both attempting to as well as actually collecting permanent and total disability compensation. For instance, the claimant on 12-2-98, 11-27-97, and 11-25-98, signed documents indicating that she has not been working. The claimant was also aware that she had to notify the BWC as soon as she bean [sic] working. She had signed documents on 6-22-88, 11-18-90, and 12-29-95 indicating her responsibility in this regard. The claimant also signed payment documents on 11-13-96 and 4-9-01 that indicated that she knew that she was not entitled to permanent and total disability compensation while she was working. However the claimant never notified the BWC that she was engaged in work activity inconsistent with the receipt of permanent and total disability compensation as a self-employed baby-sitter working out of her home at least from 11-1-96.
Second, the Staff Hearing Officer further finds that the above representation and concealment made by the claimant were material to the transaction at hand; namely for the purposes of receiving permanent and total disability compensation for a period of time during which the claimant would not be eligible for such compensation due to the fact that the claimant was engaged in work activity inconsistent with the receipt of such compensation. The payment of permanent and total disability compensation would not have been made but for the above misrepresentations by the claimant.
Third, the Staff Hearing Officer finds that the claimant made the above representations of fact falsely, with the knowledge of its falsity by the claimant. The claimant repeatedly represented to the BWC that she was not working, when in reality the claimant was working. The claimant also admitted in the above-signed forms as well as in an interview on 2-8-00 that she knew of her duty to inform the BWC of any change in her work status.
Fourth, the Staff Hearing Officer finds that the claimant made the above misrepresentations with the intent of misleading the BWC into relying upon it. Specifically, the claimant pursued and received payment of permanent and total disability compensation while she was working as a baby[-] sitter from her home.
Fifth, the Staff Hearing Officer finds that there was justifiable reliance by another individual upon the above misrepresentations and concealment of the claimant. Specifically, the BWC relied upon the claimant's misrepresentations and paid the claimant permanent and total disability compensation while the claimant was engaged in work activity inconsistent with the receipt of permanent and total disability compensation.
Sixth, the Staff Hearing Officer finds that there was a resulting injury caused by the reliance upon the above misrepresentations and concealment. Namely, there was payment of permanent and total disability compensation to the claimant during a period of time when the claimant was not eligible for such compensation due to being engaged in work activity inconsistent with the receipt of permanent and total disability compensation.
In addition to the above cited evidence attached to the BWC motion filed 5-3-01, the claimant at today's hearing admitted that she performed baby[-]sitting services for various individuals at various times since 11-1-96. This testimony is consistent with the surveillance reports summarized in the attachments to the BWC motion filed 5-3-01. Each time that surveillance was performed, there were multiple individuals that stopped by the claimant's house early in the morning. As the claimant was questioned at today's hearing about each individual surveillance daily report, she admitted again and again that children were being dropped off by their parents. The claimant again indicated that she was never paid for the extensive baby-sitting that she performed (and indeed which she still performs today). However, the claimant could provide no satisfactory explanation as to the interviews in file of Chad Zimmerman and Karen Rubendall, who each indicated that they had paid the claimant for extended periods of baby-sitting performed by the claimant during the period that the claimant also was paid permanent and total disability compensation.
The claimant also could not provide a satisfactory explanation of the almost $18,000 that has been deposited into her checking account during the above declared overpayment period. She and her husband alleged that some of the numerous personal checks written to the claimant were for auto body work performed by he [sic] claimant's husband out of their home. However, there are no business records or notation on any of the personal checks to support this explanation. The claimant's husband indicated that there were no records of the work performed because he did not want to declare the income derived from this auto body work performed for others at his home. He and his wife would personally tell the check writers to leave the "memo" section of the checks blank. Mr. C. Johnson verified this practice by indicating at today's hearing that he left the "memo" section of his personal checks to the claimant blank because "I was told that's the way they wanted it". Over and above the unreported and undocumented auto body work checks, the claimant and her husband had no suitable explanation of the reason for numerous additional personal checks written to the claimant over the years, including checks written to the claimant by people who had received baby-sitting services from the claimant, and who indicated that they had paid the claimant for baby-sitting services performed by the claimant. When all of the evidence is considered, the claimant's allegation that she did not perform baby-sitting work and that she was never paid for her baby-sitting work is found not to be credible.
Further, even if the claimant were found to be credible in her allegation that she was never paid for her extensive and ongoing baby-sitting work, the claimant would still not be eligible for permanent and total disability compensation. This is because the test for the claimant's continued PTD eligibility is not whether she actually performed sustained remunerative employment; the standard is whether the claimant was capable of sustained remunerative employment. State ex rel.Hartness v. Kroger Co. (1998), 81 Ohio St.3d 445; State ex rel. Frazierv. Conrad (2000), 89 Ohio St.3d 166.
The relevant issue to be decided in a determination of permanent and total disability (PTD) is the claimant's ability to do any sustained remunerative employment. State, ex rel. Domjancic v. Indus. Comm., (1994), 69 Ohio St.3d 693. Entitlement to PTD compensation requires a showing that the medical impairment due to the allowed conditions, either alone or together with non-medical disability factors, prevents the claimant from engaging in any and all sustained remunerative employment.State, ex rel. LTV Steel Co. v. Indus. Comm. (1992), 65 Ohio St.3d 22;State, ex rel. Firestone Tire and Rubber Co. v. Indus. Comm. ([1]990),49 Ohio St.3d 283; State, ex rel. Jennings v. Indus. Comm. (1983),1 Ohio St.3d 101.
While the Supreme Court has never specifically defined what constitutes sustained remunerative employment, even parttime work can constitute sustained remunerative employment. State ex rel. Toth v. Indus. Comm.
(1997), 80 Ohio St.3d 360; State ex rel. Allied Energy Business Systemsv. Seymour (1998), 83 Ohio St.3d 518. In addition, the Supreme Court of Ohio has ruled that a claimant who cannot perform a full range of sedentary jobs but can nontheless [sic] perform some sedentary jobs is therefore capable of sustained remunerative employment. State ex rel.Wood v. Indus. Comm. (1997) 78 Ohio St.3d 414[,] 418. The extensive and ongoing baby-sitting activity performed by the claimant certainly falls into this category. The claimant performed this activity for a number of individuals over an extended period of time.
An award of permanent total disability compensation should be reserved for the most severely disabled workers and should be allowed only when there is no possibility for reemployment. State ex rel. B.F. GoodrichCo. v. Indus. Comm. (1995), 73 Ohio St.3d 525.
In this particular claim, the claimant was clearly engaged in work activity inconsistent with the receipt of permanent and total disability compensation. In addition, the claimant repeatedly withheld that information from the BWC during the period that she was paid permanent and total disability compensation.
Based on the above, as well as a careful consideration of all evidence in file and at today's Hearing, the Staff Hearing Officer grants the Motion, filed by the Administrator on 5-3-01 as is consistent with this order.
(Emphasis sic.)
 {¶ 42} 18. On September 17, 2001, relator applied for reconsideration of the SHO's order of August 29, 2001. In addition to reconsideration, relator requested that the commission subpoena various witnesses, including Chad Zimmerman, Karen Rubendall and Kim Bilotta. Relator asserted that the commission should reconsider based upon an alleged clear mistake of fact, clear mistake of law, new and changed circumstances, and error by an inferior tribunal. The request for reconsideration was supported by a legal memorandum from relator's counsel.
 {¶ 43} 19. On October 3, 2001, the commission mailed an order denying relator's September 17, 2001 request for reconsideration. The order states that reconsideration is denied "for the reason that the request fails to meet the criteria of Industrial Commission Resolution No. R98-1-3 Dated May 6, 1998."
 {¶ 44} 20. Following the commission's October 3, 2001 denial of reconsideration, relator obtained affidavits from Sadie Scott, Tami Potts, Pamela Smith, Jennifer Johnson, and Shane Patrick, all executed on November 11, 2001.
 {¶ 45} 21. The affidavit of Sadie Scott states:
* * * Affiant states that on occasion Lenore would baby[-]sit her five-year old son as a favor. When Affiant would leave her son with Lenore, it was common that her sister, Micki, would be there as well to help out. This baby[-]sitting was done sporadically when Affiant needed it and was never on a sustained regular basis. Furthermore, the Affiant states that at no time did she ever pay Lenore for this help. * * *
 {¶ 46} 22. The affidavit of Tami Potts states:
* * * Affiant has reviewed the checks which were allegedly made out to Ms. Collins for baby[-]sitting. Affiant states that the September 19, 1997 check was for a yard sale and the January 30, 1998 check was for some detail work on her husbands truck which was performed by Darrell Collins. Although I have one child at no time did Lenore baby[-]sit for her.
 {¶ 47} 23. The affidavit of Pamela Smith states:
* * * Affiant states that she is a close friend of Lenore Collins. Affiant states that on occasion Lenore would baby[-]sit for her children. Lenore would also occasionally drive them to or pick them up from the bus stop which was a few miles from Affiants home. At no time was Lenore paid for this help, although occasionally Affiant would reimburse her for gas money. * * *
 {¶ 48} 24. The affidavit of Jennifer Johnson states:
* * * Affiant states that she is the sister-in-law of Lenore Collins. Affiant states that she has read the C-86 Motion filed by the Bureau of Workers' Compensation and has examined the checks written to Lenore Collins. Affiant states that the November 1, 1996 and May 21, 1997, checks were for body work performed by Darrell Collins. The check dated March 3, 1997 in the amount of $40.00, was a re-payment of a loan Lenore had given to the Affiant earlier. At no time did Affiant ever give Lenore a check for baby[-]sitting. * * *
 {¶ 49} 25. The affidavit of Shane Patrick states:
* * * Affiant states that he is the son of Lenore G. Collins. Affiant states that he is currently thirty years of age. * * *
Affiant states that in late 1996, he was involved in a relationship with a woman by the name of Kim Bilotta. Ms. Bilotta had two children from a previous relationship. On several occasions, Ms. Bilotta would leave the children at my mother's house without notice and without asking if it was alright with her. In particular, on at least one occasion in late 1996, Ms. Bilotta left her children at my mother's house for an entire weekend without telling either of us if and when she was coming back. During this weekend, many clothes and supplies had to be purchased. As I could not afford them personally, my mother volunteered to pay for them. After the children were finally picked up later that week, it is my understanding that Ms. Bilotta had her mother, Karen Rubendall, re-imburse [sic] my mother for these unexpected expenses for taking care of the children.
As far as I can remember, my mother was never paid for anything more than these unexpected expenses by Ms. Bilotta's mother. I can state with certainty that Ms. Bilotta never paid my mother or myself one penny for taking care of these children when she would leave. Furthermore, I am not aware of any other people paying my mother for baby-sitting.
 {¶ 50} 26. On January 3, 2002, relator filed a motion on form C-86 requesting that the commission:
* * * [I]nvoke its continuing jurisdiction to correct both a clear mistake of fact, as well as a mistake of law by making a finding that Ms. Collins was paid for her baby[-]sitting as stated in Industrial Commission order dated September 1, 2001. Furthermore, claimant requests that as this order was based on a clear mistake of fact as well as an improper application of law regarding the burden of proof for fraud that the entire order be vacated and a new hearing be scheduled on the issue of permanent total disability.
 {¶ 51} 27. The C-86 form also asks the movant to identify the evidence offered in support of the motion. In response, relator listed the above noted affidavits of Sadie Scott, Tami Potts, Pamela Smith, Jennifer Johnson, and Shane Patrick all executed on November 11, 2001.
 {¶ 52} 28. In a letter dated December 28, 2001, and filed with the commission on or about the date that relator filed her motion for continuing jurisdiction, relator requested that the commission subpoena the bureau's investigatory file to obtain information on the whereabouts of Karen Rubendall and Kim Bilotta. The letter further requested that the commission subpoena Rubendall and Bilotta for appearance at a hearing on relator's motion for continuing jurisdiction.
 {¶ 53} 29. According to relator, on January 8, 2002, the bureau issued a "Notice of Referral" to the commission regarding relator's January 3, 2002 motion for the exercise of continuing jurisdiction. (See Relator's brief at 11; January 9, 2002 Letter of Relator's Counsel, Stipulation of Evidence at 39.) However, relator has failed to submit a copy of the Notice of Referral in the stipulation of evidence. The Notice of Referral is referenced in a letter from relator's counsel dated January 9, 2002.
 {¶ 54} 30. On February 14, 2002, the commission mailed an order stating:
The Request for Reconsideration filed 01-03-2002, by the Injured Worker from the findings mailed 10-03-2001, is denied for the reason that the request fails to meet the criteria of Industrial Commission Resolution No. R98-1-3 Dated May 6, 1998.
 {¶ 55} 31. By letter dated February 19, 2002 (and apparently filed February 21, 2002), relator's counsel objected that the commission had treated the January 3, 2002 motion as another request for reconsideration. In the letter to the commission, relator's counsel argued:
I believe that there is some confusion here, as the motion filed January 3, 2002 was not a request for reconsideration pursuant to R98-1-3. In fact, a motion requesting relief under resolution number R98-1-3 was already denied back on October 3, 2001. The motion that was filed on January 3, 2002 is rather a request asking the Industrial Commission of Ohio to make a ruling on whether or not the new evidence submitted constitutes new and changes [sic] circumstances to establish that a mistake of fact, and consequently a mistake of law, occurred in the original PTD hearing.
Therefore, we feel it would be a violation of due process to deny this motion before a hearing officer has adjudicated whether in fact new and changed circumstances have occurred. Therefore, at this time we are asking that you please once again process the motion filed January 3, 2002 and refer it to the Industrial Commission for further hearing.
 {¶ 56} 32. On May 23, 2002, the commission mailed an order stating:
The letter filed 02-21-2002, by Injured Worker is construed as a Request for Reconsideration of the findings mailed 02-14-2002.
The findings mailed 02-14-2002, represents the final administrative determination under Industrial Commission Resolution No. R98-1-3 Dated May 6, 1998.
Therefore, the second Request for Reconsideration is denied.
 {¶ 57} 33. On January 8, 2004, relator, Lenore Collins, filed this mandamus action.
 {¶ 58} Conclusions of Law:
 {¶ 59} Relator presents three issues: (1) whether the commission abused its discretion in terminating PTD compensation and declaring an overpayment, as relator states, "absent a finding that [s]he is capable of sustained remunerative employment"; (2) whether the commission abused its discretion by relying upon the statements of witnesses that are allegedly "unverified" and "un-notarized"; and (3) whether the commission abused its discretion in refusing to set for hearing relator's January 3, 2002 motion for the exercise of continuing jurisdiction.
 {¶ 60} The magistrate finds: (1) the commission's decision to terminate PTD compensation and declare an overpayment is not "absent a finding that [s]he is capable of sustained remunerative employment"; (2) the commission did not abuse its discretion by relying upon the statements of witnesses; and (3) the commission did not abuse its discretion by refusing to set relator's January 3, 2002 motion for a hearing at which relator would have the opportunity to subpoena the attendance of witnesses.
 {¶ 61} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 62} In general, the lifetime nature of a PTD award "does not, however, mean that the award is completely immune from later review."State ex rel. Smothers v. Mihm (1994), 69 Ohio St.3d 566, 567. If the commission learns that the claimant is working or engaging in activity inconsistent with his or her PTD status, the commission can use its continuing jurisdiction under R.C. 4123.52 to reopen the matter. Id. at 567-568.
 {¶ 63} PTD compensation is improper when a claimant is either performing sustained remunerative employment or is capable of doing so.State ex rel. Alesci v. Indus. Comm., 97 Ohio St.3d 210, 2002-Ohio-5932. A claimant who does sustained remunerable activity without pay demonstrates that he/she is capable of doing that same work for remuneration. State ex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27,2002-Ohio-3316.
 {¶ 64} The first issue relator presents here is premised upon relator's misreading of the SHO's order of August 29, 2001. Relator incorrectly asserts that "it does not appear from the face of the commission's order that it terminated Collins' PTD compensation based upon any finding that she is capable of sustained remunerative employment." (Relator's brief at 8.)
 {¶ 65} It is clear from a reading of the SHO's order of August 29, 2001, that the commission found that relator had engaged in "sustained remunerative employment as a self-employed baby-sitter at her home" beginning November 1, 1996. It is also clear from the order that the commission found that relator was paid for her baby-sitting work. In fact, relator's counsel before the administrative proceedings seems to have understood the finding when, on January 3, 2002, he moved for the commission's exercise of continuing jurisdiction to correct an alleged clear mistake of fact and law that relator "was paid for her baby-sitting."
 {¶ 66} Obviously, if the commission found that relator had engaged in sustained remunerative employment during the period of her receipt of PTD compensation, it necessarily follows that she is capable of sustained remunerative employment. It goes without saying that someone who performs sustained remunerative employment is capable of performing sustained remunerative employment.
 {¶ 67} Turning to the second issue, R.C. 4123.10 provides that the commission "shall not be bound by the usual common law or statutory rules of evidence." R.C. 4123.10 vests the commission with the authority to admit and consider materials of a quasi-evidentiary nature. State exrel. Roberts v. Indus. Comm. (1984), 10 Ohio St.3d 1, 5; State ex rel.Durant v. Superior's Brand Meats, Inc. (1994), 69 Ohio St.3d 284, 293.
 {¶ 68} Moreover, Ohio Adm. Code 4121-3-09(A)(1) provides that "[p]roof may be presented by affidavit, deposition, oral testimony, written statement, document, or other forms of evidence."
 {¶ 69} Here, relator asserts in an unspecified manner that the SIU report contains "several unverified recollections of conversations as recorded by the BWC fraud department." (Relator's brief at 10.)
 {¶ 70} As the SHO's order of August 29, 2001 shows, the SHO did rely, for example, upon the statements of Karen Rubendall and Chad Zimmerman who both stated that they had paid relator for baby-sitting services performed by her.
 {¶ 71} As previously noted, Karen Rubendall was interviewed by telephone by SIU agent Kish on March 21, 2000, when agents Kish and McCloskey interviewed Rubendall's daughter, Kim Bilotta. Rubendall's statements were reported by agent Kish in a typewritten memorandum or report dated March 22, 2000.
 {¶ 72} Rubendall did not sign or "verify" Kish's reported recollection of her statements to him. However, R.C. 4123.10 and Ohio Adm. Code 4121-3-09(A)(1) grant the commission the discretion to accept and rely upon this type of evidence. In this regard, the magistrate notes that the record shows that agent Kish reduced his recollection to written form in a memorandum the day following the conversation being reported. That the Rubendall interview was reported in writing at or near the time of the interview is an indicia of reliability. The magistrate also notes that Rubendall's statements to agent Kish during the telephone call were corroborated by Bilotta's statements. Under the circumstances, agent Kish's report of the Rubendall interview is some evidence upon which the commission can rely.
 {¶ 73} The magistrate further notes that the statements of Chad Zimmerman contained in the March 22, 2000 written report of agent Kish were also reported the day following the interview. Moreover, Zimmerman's statements as reported by agent Kish are corroborated by a statement that Chad Zimmerman himself signed in the presence of agent Kish.
 {¶ 74} In sum, contrary to relator's assertion here, it was not an abuse of discretion for the commission to rely upon unsigned and so-called "unverified" statements obtained by the SIU agents during their investigation. Also, there was no requirement that any of the statements be notarized.
 {¶ 75} The third issue is whether the commission abused its discretion in refusing to set for hearing relator's January 3, 2002 motion for the exercise of continuing jurisdiction.
 {¶ 76} The commission treated relator's January 3, 2002 motion as another request for reconsideration. It issued an order denying the request "for the reason that the request fails to meet the criteria of Industrial Commission Resolution No. R98-1-3 Dated May 6, 1998."
 {¶ 77} Commission Resolution No. R98-1-3 begins with the following pronouncements:
WHEREAS, Section 4123.52 of the Ohio Revised Code provides that the jurisdiction of the Industrial Commission over each case is continuing and the Commission may make such modification or change with respect to former findings or orders with respect thereto, as, in its opinion is justified; and
WHEREAS, the case of State, ex rel. Gatlin v. Yellow Freight Company
(1985), 18 Ohio St.3d 246, found that regardless of the existence of a legislatively prescribed court appeal, the Industrial Commission has continuing jurisdiction to reconsider its orders for a reasonable period of time absent statutory regulations restricting the exercise of reconsideration; and
WHEREAS, the case of State, ex rel. Nicholls v. Industrial Commission
(1998), 81 Ohio St.3d 454, stated that continuing jurisdiction of the Industrial Commission is not unlimited and that its prerequisites are: (1) new and changed circumstances; (2) fraud; (3) clear mistake of fact; (4) clear mistake of law; or (5) error by inferior tribunal; and
WHEREAS, Section 4121.03(E)(1) of the Ohio Revised Code provides that the Commission is responsible for the establishment of the overall adjudicatory policy of the Commission[.]
(Emphasis sic.)
 {¶ 78} Pertinent here are paragraphs (D) and (E) which state:
(D) If the requirements of Sections (A) and (B) are satisfied, hearing officers designated by the Commission shall review the request for reconsideration pursuant to the following criteria:
(1) A request for reconsideration shall be considered only in the following cases:
(a) New and changed circumstances occurring subsequent to the date of the order from which reconsideration is sought. For example, there exists newly discovered evidence which by due diligence could not have been discovered and filed by the appellant prior to the date of the order from which reconsideration is sought. Newly discovered evidence shall be relevant to the issue in controversy but shall not be merely corroborative of evidence that was submitted prior to the date of the order from which reconsideration is sought.
(b) There is evidence of fraud in the claim.
(c) There is a clear mistake of fact in the order from which reconsideration is sought.
(d) The order from which reconsideration is sought contains a clear mistake of law of such character that remedial action would clearly follow.
(e) There is an error by the inferior administrative agent or subordinate hearing officer in the order from which reconsideration is sought which renders the order defective.
(E) Requests for reconsideration that do not comport with the aforementioned criteria will be denied by a staff hearing officer without being presented to the Commission members.
 {¶ 79} As respondent here correctly points out, Resolution No. R98-1-3 presents the commission's adjudicatory policy response to the decision of the Supreme Court of Ohio in State ex rel. Nicholls v. Indus. Comm.
(1998), 81 Ohio St.3d 454, a decision that sets forth parameters for the commission's exercise of its continuing jurisdiction under R.C. 4123.52.
 {¶ 80} In Nicholls, the commission granted reconsideration of an SHO's order awarding PTD compensation. The commission, through an SHO, granted reconsideration "based on the possibility of error in the previous Industrial Commission order." Id. at 456. Thereafter, the three-member commission voted to deny PTD compen-sation. The commission's explanation for its denial of the PTD application indicated that it had accepted a new vocational report from the employer. The commission reweighed the evidence before it in light of the new vocational report in reversing the SHO's PTD award.
 {¶ 81} Noting that the commission's continuing jurisdiction under R.C. 4123.52 is not unlimited, the Nicholls court stated that its prerequisites are: (1) new and changed circumstances; (2) fraud; (3) clear mistake of fact; (4) clear mistake of law; and (5) error by inferior tribunal.
 {¶ 82} In reviewing the commission's proceedings, the Nicholls court could not find the existence of a prerequisite for the exercise of continuing jurisdiction. The commission specifically noted that the employer's submission of the new vocational report was not previously undiscoverable since the employer could have "discovered" the vocational evidence it sought months earlier instead of waiting until the adjudicatory process was well underway.
 {¶ 83} The Nicholls court criticized the SHO's order that had granted reconsideration:
* * * The reconsideration order cites only the possibility of error, and an unspecified error at that.
Our approval of the staff hearing officers' order on reconsideration would effectively give the commission unrestricted jurisdiction. Error is always possible, and its existence cannot be refuted when the commission is not made to reveal what the perceived error is. We find, therefore, that the mere possibility of unspecified error cannot sustain the invocation of continuing jurisdiction.
Id. at 459. (Emphasis sic.)
 {¶ 84} Accordingly, the Nicholls court issued a writ of mandamus ordering the commission to reinstate the PTD award.
 {¶ 85} In State ex rel. Foster v. Indus. Comm. (1999),85 Ohio St.3d 320, the Supreme Court of Ohio issued writs of mandamus and prohibition against the commission to prevent the commission from proceeding with the reconsideration of an order granting PTD compensation. In Foster, the commission had issued a recon-sideration order asserting that the order granting PTD compensation contained a clear mistake of fact and law. However, the commission's reconsideration order failed to identify the error upon which reconsideration was being granted. Citing its prior decision in Nicholls, the Foster court held that the commission had improperly asserted its continuing jurisdiction.
 {¶ 86} In State ex rel. Royal v. Indus. Comm. (2002), 95 Ohio St.3d 97, applying its previous decisions in Nicholls and Foster, the court held that the commission's identification of the error after reconsideration fails to satisfy the prerequisites for the exercise of continuing jurisdiction. The court explained:
Identification of error after reconsideration does allow a reviewing court to adjudicate the propriety of the commission's invocation of continuing jurisdiction. It does little to help the party opposing the motion, since it comes too late to allow a meaningful challenge to reconsideration at the administrative level.
Id. at 100. (Emphasis sic.)
 {¶ 87} Analysis of the continuing jurisdiction issue here begins with the observation that Nicholls, Foster and Royal, dealt with the commission's grant of reconsideration whereas relator here challenges the commission's denial of reconsideration. Given the difference in the procedural posture of this case, the focus of the review here is upon the adequacy of the grounds relator presented in support of her January 3, 2002 motion for the exercise of continuing jurisdiction rather than upon the specificity, or lack thereof, of the commission's order denying reconsideration.
 {¶ 88} As previously noted, on the C-86 form filed January 3, 2002, relator asked the commission to invoke its continuing jurisdiction "to correct both a clear mistake of fact, as well as a mistake of law by making a finding that Ms. Collins was paid for her baby[-]sitting." As previously noted, the C-86 form cited to several new affidavits that relator had obtained on November 11, 2001, after the SHO had issued his August 29, 2001 order. In a letter from relator's counsel dated February 19, 2002, counsel attempted to clarify the January 3, 2002 motion by explaining that the motion was a request that the commission "make a ruling on whether or not the new evidence submitted constitutes new and change[d] circumstances to establish that a mistake of fact, and consequently a mistake of law occurred in the original PTD hearing."
 {¶ 89} Clearly, relator's January 3, 2002 motion fails to identify a clear mistake of fact or a clear mistake of law upon which the commission could exercise continuing jurisdiction. There can be no clear mistake of fact or clear mistake of law when the premise for those prerequisites is the submission of new evidence that was not previously before the commission.
 {¶ 90} It is clear to this magistrate that relator was in fact asking the commission to consider new evidence which would necessarily require relator to invoke new and changed circumstances as set forth in Resolution No. R98-1-3.
 {¶ 91} It is clear that the affidavits executed November 11, 2001, failed to demonstrate new and changed circumstances occurring subsequent to the date of the order from which reconsideration was sought. There has been no assertion from relator that the affidavits could not have been obtained by due diligence for submission at the August 29, 2001 hearing. Moreover, the affidavits present evidence that is merely corroborative of evidence that relator submitted at the August 29, 2001 hearing. The new affidavits merely tend to corroborate relator's own affidavit and the affidavit of her husband which were submitted to the SHO at the August 29, 2001 hearing.
 {¶ 92} In short, the affidavits executed November 11, 2001 present no basis for the commission's exercise of continuing jurisdiction. Given that the affidavits present no basis for the exercise of continuing jurisdiction, the commission was not required to set relator's motion for a hearing or to issue subpoenas for the attendance of witnesses for such hearing.
 {¶ 93} Here, relator argues that R.C. 4121.34(B) required the commission to schedule her January 3, 2002 motion for a hearing before a district hearing officer. R.C. 4121.34(B) sets forth the original jurisdiction of district hearing officers. The magistrate notes that R.C. 4121.35(B) sets forth the original jurisdiction of staff hearing officers. R.C. 4121.35(B)(1) provides that staff hearing officers shall have original jurisdiction over applications for PTD compensation.
 {¶ 94} It is clear that the SHO who heard the bureau's motion to terminate PTD compensation on August 29, 2001, had original jurisdiction to hear the bureau's motion under R.C. 4121.35(B)(1). In fact, relator has never asserted to the contrary. Nevertheless, relator now asserts that her January 3, 2002 motion for the exercise of continuing jurisdiction over her PTD application should have been scheduled for hearing before a district hearing officer. Clearly, R.C. 4121.34(B) confers no jurisdiction upon a district hearing officer to hear or rule upon relator's January 3, 2002 motion regarding her PTD status.
 {¶ 95} Moreover, the original jurisdiction statutes relating to commission hearing officers do not address the issue that relator attempts to present in this action. There is no real question here that the commission's SHO had jurisdiction to rule upon relator's January 3, 2002 motion. Clearly, the original jurisdiction statutes relating to the commission's hearing officers do not require the commission to schedule a hearing to adjudicate a motion that, on its face, presents no basis for the exercise of continuing jurisdiction.
 {¶ 96} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 /s/ Kenneth W. Macke KENNETH W. MACKE MAGISTRATE
[1] According to the stipulated record, relator's motion was filed on January 2, 2002, not January 3, 2002, as stated in relator's objections and in the magistrate's finding of fact No. 26.