DECISION
{¶ 1} In this original action, relator, Freddie Kugler, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order terminating permanent total disability ("PTD") compensation and disabled workers' relief fund ("DWRF") compensations, declaring an overpayment of those compensations *Page 2 
beginning May 1, 1996, and finding that the compensations were fraudulently obtained, and to enter an order reinstating those compensations.
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53(D) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate examined the evidence and issued a decision (attached as Appendix A), including findings of fact and conclusions of law. Therein, the magistrate concluded: (1) the rules of evidence did not preclude the commission's reliance upon the evidence which it relied; (2) the commission's finding that relator demonstrated a capacity for performing sustained remunerative employment is supported by some evidence; (3) the commission's declaration that the overpayment began May 1, 1996 is supported by some evidence; and (4) the commission did not abuse its discretion in finding that the compensations were fraudulently obtained. Therefore, the magistrate recommended that this court deny relator's request for a writ of mandamus.
 {¶ 3} Relator has filed the following five objections to the magistrate's decision:
 RELATOR'S FIRST OBJECTION:
 The magistrate erred as a matter of law by failing to apply the Ohio Rules of Evidence in determining the merits of this mandamus proceeding.
 RELATOR'S SECOND OBJECTION:
 The conclusions of fact contained within the magistrate's decision are erroneous and not supported by the record since the magistrate did not apply the Ohio Rules of Evidence.
 RELATOR'S THIRD OBJECTION:
 The magistrate's finding that the relator was capable of sustained remunerative employment from May 1, 1996 *Page 3 
through November 1, 2006 is not supported by the evidence and record in this case.
 RELATOR'S FOURTH OBJECTION:
 There is insufficient evidence to support the magistrate's decision that relator was engaged or capable of engaging in sustained remunerative employment from May 1, 1996 through November 1, 2006.
 RELATOR'S FIFTH OBJECTION:
 There is insufficient evidence to support the magistrate's decision that the relator committed fraud.
 {¶ 4} In his first objection, relator contends the magistrate erred in not applying the Ohio Rules of Evidence to the matter at hand. As stated by the magistrate, it is clear that the commission "shall not be bound by the usual common law or statutory rules of evidence." R.C. 4123.10. Further, our standard of review is whether the record contains some evidence which supports the commission's findings. For these, and the reasons stated in the magistrate's decision, relator's first objection is overruled.
 {¶ 5} Because we have overruled relator's first objection, relator's second objection is rendered moot, and is therefore, overruled as such.
 {¶ 6} Relator's remaining objections concern the evidence supporting the commission's determination that relator was capable of and/or engaged in sustained remunerative employment from May 1, 1996 through November 1, 2006, and the commission's determination that relator committed fraud. These arguments, however, are the same as those made to, and addressed by, the magistrate. For the reasons set forth in the magistrate's decision, we do not find relator's position well-taken. *Page 4 
 {¶ 7} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, relator's objections to the magistrate's decision are overruled, and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled, writ of mandamus denied. BROWN and TYACK, JJ., concur. *Page 5 
 APPENDIX A MAGISTRATE'S DECISION Rendered on September 28, 2007 IN MANDAMUS {¶ 8} In this original action, relator, Freddie Kugler, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") and disabled workers' relief fund ("DWRF") compensations, declaring an overpayment of those compensations beginning May 1, *Page 6 
1996, and finding that the compensations were fraudulently obtained, and to enter an order reinstating those compensations. Findings ofFact:
 {¶ 9} 1. On March 30, 1970, relator sustained an industrial injury while employed with Libbey-Owens Ford Company. The industrial claim is allowed for "low back strain; lumbosacral degenerative disc disease," and is assigned claim number 70-20118.
 {¶ 10} 2. On August 11, 1982, relator filed an application for PTD compensation. On the application, relator stated that he was last gainfully employed in 1975.
 {¶ 11} 3. Relator's application prompted the commission to have relator examined by W. Jerry McCloud, M.D., on September 16, 1982. Dr. McCloud reported:
 * * * I think it sufficient to relate that this patient did have a laminectomy and a disc excision in 1975 or 1976 and did not have a good result from that surgery. He did not specifically have any relief of his leg pain and that constitutes his primary complaints at this time. He has been unable to work in any capacity since the time of the surgery primarily because of the leg complaints and secondarily because of pain and limitation of motion in his lower back as well. Additional diagnostic measures have been employed to further delineate the exact nature of his problems and a suggestion of re-operation and possibly fusion of his lower back has been considered.
 * * *
 In summary, this patient has a very profound post laminectomy syndrome with chronic compromise of the fifth lumbar nerve root on the right side. I would estimate that this is primarily secondary to scarring of the nerve root itself as he has very few findings at any other level and no findings on the left side. His x-rays have been reported as showing severe degenerative changes and possibly there could be some contribution from this fact as well but nevertheless, he does have considerable compromise from whatever the cause. He cannot reasonably expect any improvement [in] these symptoms from this point forward as well. The key to *Page 7 
his evaluation is the presence of all of these various changes in the various positions.
 It is my opinion that this patient does present with medical evidence consistent with considering him permanently and totally impaired.
 {¶ 12} 4. In October 1982, Libbey-Owens Ford Company executed an agreement that relator should be awarded PTD compensation.
 {¶ 13} 5. Following a November 19, 1982 hearing, the three-member com-mission issued an order awarding relator PTD compensation beginning August 31, 1981, based upon the report of Dr. McCloud.
 {¶ 14} 6. On July 19 and 20, 2005, the Toledo Special Investigations Unit ("SIU") of the Ohio Bureau of Workers' Compensation ("bureau") was informed by confidential callers using the bureau hotline that relator was running a bait store and doing business as the "Bait Bucket" on Edgewater Drive in Toledo, Ohio.
 {¶ 15} 7. On August 3, 2005, SIU obtained and reviewed so-called "PTD contact letters" dated October 28, 1997, October 6, 1998, October 5, 1999, October 5, 2000, July 4, 2001, July 2, 2003, July 7, 2004 and July 5, 2005. The PTD contact letters are mailed to PTD recipients by the bureau to obtain current information regarding PTD status. The form letters dated October 28, 1997 and October 6, 1998 each present the following query: "Have you returned to work during the last year?" In response to the queries, relator circled the "No" response and signed the PTD contact letters.
 {¶ 16} 8. The form letters dated October 5, 1999, October 5, 2000, July 4, 2001, July 2, 2003, July 7, 2004 and July 5, 2005 each present the following query: "Are you currently working or have you worked since you were granted PTD benefits?" In response to the queries, relator circled or marked the "No" response for all the letters *Page 8 
except the letter dated July 4, 2001. Relator did not respond to the query on the letter dated July 4, 2001. Each letter is signed by relator.
 {¶ 17} 9. On August 8, 2005, SIU special agent Mitchey and SIU fraud analyst Stein briefly initiated surveillance of the Bait Bucket. At approximately 3:00 p.m., the agents observed relator's dark blue GMC truck parked on the north side of the building along with a Ford Ranger owned by Paul Murray.
 {¶ 18} 10. The SIU investigation continued well into March 2006. Thereafter, SIU prepared a 15-page typewritten report ("SIU report") with attached exhibits. The SIU report is contained in the record before this court.
 {¶ 19} 11. According to the SIU report, on August 9, 2005, special agents Mitchey and Debrock-Matzinger traveled to the Bait Bucket. The SIU report states:
 * * * SA [Special Agent] Debrock-Matzinger entered the Bait Bucket at 1:48 pm and observed KUGLER waiting on a male customer, who was picking up fish that had been cleaned at the shop. KUGLER looked through the cooler behind the counter, selected one bag, and checked in the back room for something that was missing. The customer said he would just take the one bag and KUGLER rang up the sale for $13, made change from the register for a $20 bill, and the customer left. SA Debrock-Matzinger then inquired about charter boat fishing trips. KUGLER advised that he did not do them * * *. KUGLER searched through an address book at the desk and provided SA Debrock-Matzinger with a telephone number of someone out of Luna Pier, Michigan, who might take a small group out for a day. SA Debrock-Matzinger asked about fishing licenses and KUGLER informed that he sold them at the Bait Bucket and provided prices for a one day and a seasonal license. When asked, KUGLER informed that he also cleaned fish and that perch cost $1 per pound to clean. KUGLER stated that he bags it down and ices it until it is picked up. SA Debrock-Matzinger asked if she could give the Luna Pier contact a name for the referral, and KUGLER stated just say "the Bait Bucket guy." *Page 9 
 {¶ 20} 12. According to the SIU report, on August 16, 2005:
 * * * SA Mitchey arrived early at the Bait Bucket to determine who opened the shop. There were no vehicles at the business when SA Mitchey arrived at 5:30 am. At 6:28 am, KUGLER arrived driving his light blue car, #CSH6069. KUGLER unlocked the ice cooler and front door, entered and turned on the lights. At 6:36 am, KUGLER retrieved a bag from his vehicle. At 6:40 am, a male customer entered the Bait Bucket with a five gallon bucket and then carried in two large bags. The customer left at 6:44 am and placed the five gallon bucket in the trunk of his vehicle. * * * KUGLER was still at the Bait Bucket when SA Mitchey terminated surveillance at approximately 7:30 am. SA Mitchey returned to the Bait Bucket at 12:46 pm * * * SA Mitchey observed KUGLER outside of the Bait Bucket wearing a white t-shirt and jean shorts. SA Mitchey terminated surveillance at 1:07 pm * * *.
 {¶ 21} 13. According to the SIU report, on August 23, 2005:
 * * * SA Mitchey arrived early at the Bait Bucket to determine who opened the shop. KUGLER arrived at 7:01 am driving his truck, #BJ86FK, and there was a W/M, who appeared to be in his 60's, riding as a passenger. * * * Two male customers entered shortly after KUGLER opened the business. * * * Later on the same day, FA [Fraud Analyst] Cathy Owens conducted an undercover at the Bait Bucket at 12:41 pm. FA Owens entered under the pretense that she wanted to get some fish cleaned for her grandfather. KUGLER informed FA Owens that he was the owner of the Bait Bucket and had some other people who helped him clean fish if needed. KUGLER advised that he was open from mid-May through November and provide FA Owens with a business card * * *. KUGLER informed FA Owens that he charged $1.00 per pound for perch and $.50 per pound for walleye. * * *
 {¶ 22} 14. According to the SIU report, on August 30, 2005:
 * * * FA Stein conducted an undercover from approximately 2:41 pm until 2:47 pm inquiring about fishing lures. KUGLER advised that he did not have lures for salmon fishing but proceeded to show FA Stein the best lure for catching perch. KUGLER informed that the lure was $2.00 and FA Stein gave KUGLER a $5.00 bill. KUGLER provided FA Stein *Page 10 
change from the register. FA Stein inquired about fish cleaning. KUGLER informed FA Stein that the fish is weighed when it is brought in and advised of the charges. KUGLER stated that the fish would be ready the following day. KUGLER informed FA Stein that he had over 700 pounds of fish last Sunday that he cleaned. FA Stein asked KUGLER whether he cleaned all the fish himself and KUGLER informed that he had two or three other guys who worked as cutters and helped him. KUGLER explained the process of cleaning the fish. Furthermore, KUGLER informed FA Stein that he had been at this location for twelve years, prior to that he was located on Summit Street for ten years, and before that he cleaned fish commercially. FA Stein commented that KUGLER had been cleaning fish for twenty-two years and KUGLER responded "more than that, a lot more than that". * * *
 {¶ 23} 15. According to the SIU report, on September 9, 2005:
 * * * An undercover was conducted by SA Mitchey and SA Matthews at approximately 9:30 am. When the agents entered the Bait Bucket, KUGLER was in the back room cleaning fish and was the only person inside. SA Matthews purchased a one day fishing license for $11.00 and KUGLER processed the license and completed the sale. SA Mitchey inquired whether KUGLER was busy Labor Day weekend and KUGLER informed that the weekend prior they had 700 pounds of fish and Labor Day they had 500 pounds. KUGLER informed that he would be working Saturday from 6:30 am until 7:00 pm. * * *
 {¶ 24} 16. According to the SIU report, on October 6, 2005:
 * * * SA Mitchey and FA Stein traveled to A-n-J Bait in Port Clinton and interviewed/subpoenaed the owner, Jeff "AJ" Goehring. AJ confirmed that his business did supply bait to KUGLER at the Bait Bucket located on Edgewater Drive in Point Place. * * * AJ stated that KUGLER usually received approximately 8-16 pounds of minnows per week and that KUGLER paid when they were delivered. AJ indicated that he had been doing business with KUGLER since approximately 1996. AJ said that his business was family owned and that the delivery to the Bait Bucket would either be done by him or his son who is also Jeff. AJ stated that he has been in business for twenty-five years. * * * AJ advised that KUGLER starts his business up in May. AJ said that *Page 11 
KUGLER's last order was for 2 gallons. AJ also advised that KUGLER usually calls him but they may call KUGLER if they have other orders in the area. AJ stated that he dealt mainly with KUGLER. * * * AJ further stated that he always dealt with KUGLER directly and if KUGLER was not there, whoever was minding the store would call him and KUGLER would come in and take care of business. AJ stated he was not aware that KUGLER was on disability. AJ knew that KUGLER had other fish cutters who helped out and recalled seeing one other male besides KUGLER and his wife. AJ related that since KUGLER's wife died, he always had to wait for KUGLER before he could unload. When KUGLER's wife was there, she would usually give the okay and pay. AJ related that it normally took him ten minutes to make a delivery. AJ indicated that usually he took the truck back to the minnow tanks located behind the Bait Bucket building, unloaded the minnows and made sure the tank was the right temperature then after he was paid he left. * * *
 {¶ 25} 17. According to the SIU report, on October 7, 2005:
 * * * SA Mitchey and FA Stein traveled to Home City Ice, Ottawa Lake, Michigan, and spoke to a manager, Jeremy Alstaetter. Alstaetter advised that he had been in the ice business since 1997 or 1998 and a manager since 2000. Alstaetter stated that usually customers sign an invoice but KUGLER was a cash on delivery account; therefore, did not have to sign the invoices. * * * Alstaetter explained that they sell ice by the bag and that on average KUGLER usually bought fifty small bags, which are seven pounds, and approximately 10-20 large bags, which are twenty-two pounds. During the summer, Alstaetter informed that Home City Ice made approximately three deliveries per week to KUGLER. Alstaetter explained that usually they delivered the ice, unloaded it into the cooler, drew up an invoice, received payment and left. Alstaetter advised that sales to KUGLER so far this year totaled $1471.89. Alstaetter informed that Home City Ice delivered thirty small bags and ten large bags last Friday and that KUGLER was probably due for a delivery today. Alstaetter confirmed that KUGLER paid cash last Friday for the delivery. * * *
 {¶ 26} 18. According to the SIU report, on October 17, 2005, relator was interviewed by SIU agents at the Bait Bucket. The SIU report states: *Page 12 
 SA Mitchey and SA Shawn Fox traveled to the Bait Bucket to interview KUGLER and SA Matt McCloskey accompanied the agents to speak with any other employees and/or customers and interviewed Rick Knerr. After SA Mitchey, Fox and McCloskey identified themselves to KUGLER and Knerr, KUGLER immediately stated that he knew what the investigation was regarding and began to accuse his family of "turning him into Workers' Comp". KUGLER stated that the bait shop was his daughter's business, in his daughter's name, and he just "hung out" at the business since he had nothing to do. KUGLER stated that he earned no money and that it was just a "hobby". KUGLER again stated that all the paperwork was in his daughter's name. KUGLER informed that his deceased wife, Jan Kugler, owned the business from 1991 up until her death in 2000, at which time his daughter, Antionette Baker, took over the business. * * * KUGLER confirmed that the business hours for the Bait Bucket were from approximately 6:30am — 7:00am to 6:00pm — 7:00pm. KUGLER initially denied having employees and then was told about the numerous undercover operations conducted at the business. KUGLER then told the agents that any employees at the business were part-timers and friends of the business. According to KUGLER, the employees earned maybe $400.00 per year. KUGLER stated that his daughter paid the employees. KUGLER stated that there were only two employees, Rick Knerr and Paul Murray. KUGLER stated that they were part-time and would receive between $10 to $30 per day, depending on the business for the day. KUGLER stated that his youngest daughter, Penny Whipple, cleaned fish also. KUGLER stated that if he was at the business by himself and fish needed to be cleaned, he would call someone to help. KUGLER stated that he filled in for the part-timers and would perform the following duties at the business:
 — waited on customers
 — handled packages of fish for the customers
 — handled deliveries, such as live bait deliveries (KUGLER confirmed that A-n-J Bait delivered live bait to the business)
 — completed paperwork logs for fish cleaning
 — cleaned fish occasionally *Page 13 
 KUGLER insisted that he earned no income from "hanging out". KUGLER was asked if his activities at the business would take the place of hiring an employee and he replied "yes". KUGLER indicated that the business could not afford to hire a full-time employee and his "hanging out" at the business allowed him to help out his daughter. KUGLER stated that no one would work at the Bait Bucket for the money they could afford to pay them. KUGLER confirmed that he was at the business five to six days per week and five to six hours per day. KUGLER confirmed that he was always in and out of the business and that he opened it up and either he or his brother-in-law, Scott Whipple, closed it for the day. KUGLER was asked about business records and how they accounted for the fish they cleaned. KUGLER showed the agents a clip board with records showing the date, customer name, and the type of number of fish brought into the business. KUGLER stated that his daughter maintained these records to show how much fish was brought into the business to be cleaned. KUGLER confirmed that he received his PTD benefits via direct deposit into his bank account with Charter One. KUGLER denied having a business account for the Bait Bucket. KUGLER was shown eight PTD return to work letters sent to him from 1998 to July 2005. Kugler inspected each letter and confirmed that he signed each document and marked "No" next to the question inquiring whether he was employed. * * *
 {¶ 27} 19. According to the SIU report, on October 17, 2005, Rick Knerr was interviewed by SIU agents at the Bait Bucket:
 Knerr informed SA McCloskey that he had been working at the Bait Bucket since it opened, which he approximated to be eight to ten years ago. Knerr stated that KUGLER was usually at the business everyday; however, he did not own the business. Knerr informed that Antoinette Baker (KUGLER's daughter) owned the Bait Bucket. Knerr stated he was responsible for cleaning fish that was brought into the store. Knerr indicated that he was paid fifty cents per pound of fish he cleaned and that he was paid cash each week by Baker. Knerr stated that sometimes KUGLER would pay him if Baker was not available. Knerr informed that he also worked for St. Vincent's Hospital during the day. Knerr stated he arrived to the Bait Bucker everyday around 7:00 am and was let inside by KUGLER. Knerr remained at the business until approximately 9:45 am where he then went *Page 14 
home to clean and get ready for his job at St. Vincent's Hospital. Knerr stated that on weekends he spend all day at the Bait Bucket since he did not work at St. Vincent's Hospital. Knerr only cleaned fish; however, he occasionally assisted customers when needed. Knerr informed that he did not sell fishing licenses since he did not know how to do it. In regards to Baker's role at the business, Knerr stated that Baker was usually at the business every morning before she went to her day job at a medical office. Knerr stated that Baker did not clean any fish; however, she did assist customers and sell fishing licenses. Knerr stated that there were no other employees that worked at the Bait Bucket. Knerr stated that when he left for work at St. Vincent's Hospital and Baker was at her medical office job, KUGLER was at the business by himself. Knerr informed that KUGLER assisted customers with products, sold fishing licenses, and rang customers up on the register when he was at the Bait Bucket. Knerr stated that the Bait Bucket was open from 7:00 am until 6:30 pm. * * *
 {¶ 28} 20. According to the SIU report, on October 18, 2005, SIU agents interviewed Dave Ray at his place of business:
 * * * SA Mitchey and FA Stein traveled to Edgewater Bait and Tackle, which is located less than a mile from the Bait Bucket, and spoke to the owner, Dave Ray, at 8:14 am. Ray informed that he was formerly located directly across the street from the Bait Bucket for approximately two and a half (2 ½) years until he moved to his current location in 2000. When SA Mitchey indicated that she wanted to speak to him about the owner of the Bait Bucket, Ray responded "who Fred"? Ray stated that he thought KUGLER's deceased wife ran the Bait Bucket when he was located across the street but stated that KUGLER was always there too. Ray informed that he did not know what KUGLER did at the business as he had never been in his store. * * *
 {¶ 29} 21. According to the SIU report, on January 18, 2006, SIU agents interviewed Janet Beilstein who was employed by the United States Postal Service as a mail carrier:
 * * * Beilstein informed that she has handled Route 11 for approximately five or six years, which included delivering *Page 15 
mail to the Bait Bucket. During that time, Beilstein stated that she has seen KUGLER cleaning fish at the Bait Bucket but stated that KUGLER is now in Florida and the Bait Bucket is closed as it is a seasonal business. Beilstein stated that she would deliver the mail inside to KUGLER and that KUGLER was either cleaning fish or sitting down. Beilstein stated that the majority of the time KUGLER was present at the Bait Bucket when she delivered the mail. Beilstein stated that KUGLER has a couple of workers who sometimes help him with cleaning the fish and there were times when KUGLER was at the Bait Bucket alone. * * *
 {¶ 30} 22. According to the SIU report, on March 13, 2006, SIU agents interviewed Janel Bodi who is relator's stepdaughter:
 * * * Bodi informed that she began working at the Bait Bucket at the beginning of the season in May 1984, which was the year she graduated from high school, until the end of the season in in [sic] the Fall of 1999. Bodi stated that she typically worked every weekend during perch season and would work around her other jobs during the week as she was also employed at Foodtown and for a cleaning company. During that time, Bodi informed that she worked the counter at the Bait Bucket on Summit Street along with Nancy Cybulski (unsure of spelling — sister of Ralph Cybulski and neighbor of Freddie Kugler's in Florida), wrote up tickets, and weighed and cleaned fish. When Bodi began working at the Bait Bucket in 1984, KUGLER was cleaning fish for Ralph Cybulski (deceased) until KUGLER and Bodi's mother, Janet Kugler, bought the Bait Bucket from Ralph around 1990. Around 1990, KUGLER and Janet took over operating the Bait Bucket. Bodi informed that KUGLER opened the Bait Bucket around 6:00 — 7:00 am, cleaned fish, waited on customers, dealt with vendors, when to the bank for change or to make deposits, etc. on a daily basis. Bodi was unsure whether there was a business account. Bodi mentioned that KUGLER would open the Bait Bucket because her mother was not a morning person and Janet would show up in the afternoon if KUGLER needed help. If business was slow, Janet would stay and KUGLER would sometimes take off to go fishing. Bodi indicated that during walleye season they were typically open until 6:00 pm and during perch season they were sometimes open until 10:00 pm and that it all depended on how busy they were. Bodi informed that Paul Murray also had keys to the Bait Bucket *Page 16 
and would sometimes close the Bait Bucket if KUGLER was busy. Bodi informed that they all, including KUGLER, kept track of the amount of fish they cleaned on index cards and were paid cash per pound of fish they cleaned either at the end of the day or the end of the week by either KUGLER or Janet. Bodi informed that at the time she was working at the Bait Bucket, half of the proceeds or $.50 went to the business and the other half went to the worker. Bodi indicated that they were paid cash because KUGLER did not want a paper trail. Furthermore that the business was put in KUGLER's daughter's name, Antionette Baker, to further hide his activities. Bodi stated that Antionette and her husband, Bill, were rarely at the Bait Bucket. Bodi informed that the fish that were dropped off were tracked on a log sheet containing the customer's information and whether they paid and a carbon ticket was also written up for the order. Bodi stated that the records were kept on site at the Bait Bucket at the time she worked there and that she had seen the records at the Bait Bucket since then while visiting. Bodi mentioned the records being in a box underneath the counter and that KUGLER also completed the logs/tickets. Bodi stated that KUGLER started having customers pre pay for their fish and if the fish were not picked up, KUGLER would sell the fish. Bodi informed that the Bait Bucket was initially located on Summit Street until KUGLER and Janet began leasing the building on Edgewater from the Bush's around 1992. Bodi informed that they moved to be on the water and were able to sell dock spaces and gasoline at the new location. Bodi indicated that KUGLER now leases the building on Summit Street to Bill Ramp and receives $2000 per month for rent. According to Bodi, Janet learned the fish cleaning business through KUGLER, i.e. how to clean fish. Bodi informed that her mother never had a career because she became pregnant in high school and never graduated. Bodi stated that KUGLER's activities at the Bait Bucket were much more than a hobby. BODI informed that after her mother passed away in May 2000, she no longer worked at the Bait Bucket because KUGLER did not have anything to do with her after Janet passed away. * * *
 {¶ 31} 23. On August 30, 2006, the bureau moved for termination of PTD compensation, for a finding of overpayment beginning May 1, 1996, and for a finding that compensation was fraudulently obtained. *Page 17 
 {¶ 32} 24. Following a November 1, 2006 hearing, a staff hearing officer ("SHO") mailed an order on November 16, 2006 granting the bureau's motion in part. The SHO's order states:
 This Staff Hearing Officer finds that injured worker was engaging in sustained remunerative employment during the following periods: 5/1/1996 through 11/15/1996; 5/1/1997 through 11/15/1997; 5/1/1998 through 11/15/1998; 5/1/1999 through 11/15/1999; 5/1/2000 through 11/15/2000; 5/1/2001 through 11/15/2001; 5/1/2002 through 11/15/2002; 5/1/2003 through 11/15/2003; 5/1/2004 through 11/15/2004; and 5/1/2005 through 11/15/2005. This Staff Hearing Officer finds that all elements of a fraud case have been met during the aforestated periods. Collection to be paid pursuant to the Fraud provisions contained in O.R.C. Section 4123.511(J).
 This Staff Hearing Officer finds that the following periods represented overpayments due to the injured worker's proven ability to engage in sustained remunerative employment as shown by the record in this case. An OVERPAYMENT is declared for the periods of: 11/16/1996 through 4/30/1997; 11/16/1997 through 4/30/1998; 11/16/1998 through 4/30/1999; 11/16/1999 through 4/30/2000; 11/16/2000 through 4/30/2001; 11/16/2001 through 4/30/2002; 11/16/2002 through 4/30/2003; 11/16/2003 through 4/30/2004; 11/16/2004 through 4/30/2005; and 11/16/2005 through 11/1/2006. During these designated periods, the injured worker was not gainfully employed, although clearly showed an ability to work. On this basis, the aforestated time periods are declared OVERPAID and collection is to be made under the standard non-fraud provisions as stated in O.R.C. Section 4123.511(J).
 This Staff Hearing Officer further orders that any DWRF overpayment as created by this Order is not subject to the recoupment provisions of O.R.C. Section 4123.511 (J). Pursuant to Hearing Officer S.2 Item 4, DWRF overpayment may only be collected from future DWRF increases.
 Only in broad terms, this case involves an injured worker that was originally declared permanently and totally disabled by the Industrial Commission in 1982. In approximately 1990, the injured worker and his now deceased wife bought a bait store in Toledo, Ohio. The various licenses were held *Page 18 
in the now deceased wife's name. Regrettably, the injured worker's wife died in 2000. Thereafter, the various licenses were held in the name of the injured worker's daughter.
 In 2005, the Bureau of Workers' Compensation Fraud Investigators received information that Mr. Kugler was both receiving Permanent and Total Disability Compensation benefits and actively engage the management and ownership of a bait store. The Bureau of Workers' Compensation Fraud Investigator's show a number of occasions when the injured worker was opening his store, dealing with customers, and actively participating in the management and work duties required by a bait store. The Bureau of Workers' Compensation Fraud Division also gathered various documents and statements from witnesses which further show Mr. Kugler's role to be significant and active.
 Industrial Commission Policy requires a six (6) element review of the Prima Fascia elements of a fraud case. First element asked if the injured worker had a duty to disclose or conceal facts. This Staff Hearing Officer notes and specifically relies upon the correspondence sent to the injured worker on 10/28/1997, 10/6/1998, 10/5/1999, 10/5/2000, 7/7/2001, 7/7/2003, 7/7/2004, and 7/5/2005. In each case, these letters inquire, with respect to the injured worker activity and, if in fact, he was engaged in sustained remunerative employment. The injured worker returned all but one correspondence indicating that he was not indeed engaged in work activities.
 Moreover, the record is saturated with evidence showing that the various Ohio Department of Natural Resources (ODNR) records, vendors license, and soda sales licenses were all held in the name of various family members. This is judged to be clear evidence of concealment of injured worker's role in this business.
 The second element of the fraud case revolves whether the fraudulent representations must be material to the transaction at hand. This Staff Hearing Officer takes notice of the fact that the Bureau of Workers' Compensation relies heavily upon these correspondence noted above and, indeed, would not have continued payment had the injured worker's activity been disclosed. At the very least, the Bureau of Workers' Compensation would have asked for a hearing under these conditions. *Page 19 
 The third element of the fraud case requires a showing of a knowledge of the falsities of the representations or an utter disregard or recklessness concerning the statements. After a review of all of the evidence in this case, this Staff Hearing Officer is unable, under any circumstances, to conclude that the injured worker's activity at the Bait Bucket constituted a hobby as suggested by injured worker's representations.
 Indeed, the evidence suggest[s] a pattern of activity consistent with work activities. The evidence shows the injured worker dealing with vendors, handling mail, handling banking activities, as well as various sales related activities. Indeed, even injured worker's testimony at hearing betrays his innocence in this matter. The injured worker testified that, "I knew I could not have anything in my name."
 The fourth element requires a showing that the injured worker intended to mislead the Bureau of Workers' Compensation. This Staff Hearing Officer finds this element easily met given the numerous inferences drawn from the injured worker's behavior.
 The fifth element requires a showing that there was justifiable reliance on the part of the Bureau of Workers' Compensation in making the permanent and total disability payments. Payment records, as well as various representations, as outlined above, show that the Bureau of Workers' Compensation justifiably relied on the injured worker's statements and representations in continuing to make permanent and total disability payments from 1996 forward.
 The last element requires that there be a proximate cause shown between the Bureau of Workers' Compensation reliance and the unlawful payments to the injured worker. This Staff Hearing Officer finds no other causes associated with the damage as outlined by the Bureau of Workers' Compensation Fraud Divison.
 The evidence clearly shows that the bait store was only opened during the prime fishing months. For this reason, this Staff Hearing Officer finds no clear evidence that the injured worker was engaged in employment activities during the winter months. For this reason, there is no finding of fraud. However, this Staff Hearing Officer cannot ignore the evidence in injured worker's clear abilities to engage in activities consistent with that of a merchant. This Staff *Page 20 
 Hearing Officer cites the cases of State ex. rel. Schultz v. Industrial Commission of Ohio
[96 Ohio St.3d 27, 2002-Ohio-3316] and State ex. rel. Ackerman v. Industrial Commission of Ohio
[99 Ohio St.3d 26, 2003-Ohio-2448], in support of the proposition that a Hearing Officer can infer an injured worker's ability to engage in sustained remunerative employment. On this basis, this Staff Hearing Officer cannot justify payments during these winter months when injured worker's abilities are so obviously demonstrated.
 This Staff Hearing Officer notes and relies on the plethora of evidence in support of the decisions indicated above. In particular, this Staff Hearing Officer relies upon the Order of the Industrial Commission from 1982, granting the injured worker status as being permanently and totally disabled. This Staff Hearing Officer also relies upon the business records obtained by the Bureau of Workers' Compensation Fraud Division, including the ODNR vendor's lists and the vendor's licence [sic] in 1991 and renewed in 1995. This Staff Hearing Officer also notes and relies upon the records from Homes City Ice Company, dated 11/7/2005, as well as the sales summary for 2004 and 2005. These records are also buttressed by the statements of Aaron Schaub and Neal Stanford, employee/drivers for Home City Ice.
 This Staff Hearing Officer further notes and relies upon the numerous statements and interviews noted as attachments to Bureau of Workers' Compensation fraud investigation. Of particular note, were the statements from Janel Bodi and Janet Beilstin. The statements from Jeff Goehring and David Ray further buttress the conclusion that the injured worker was actively engaged as a bait merchant.
 Even the injured worker's own statement, dated 10/7/2005, clearly suggest a pattern of activities consistent with the running of a bait store business.
 Particularly persuasive was the video evidence as profered [sic] by the Bureau of Workers' Compensation Fraud Division. These films clearly show a pattern of behavior which is consistent with remunerative activities.
 For all of the above stated reasons, this Staff Hearing Officer finds the Bureau of Workers' Compensation's C-86 Motion is to be GRANTED in part. The preponderance of the evidence suggest[s] that the injured worker was either engaged in *Page 21 
sustained remunerative employment or clearly able to do so during the requested overpayment periods.
(Emphasis sic.)
 {¶ 33} 25. On January 26, 2007, relator, Freddie Kugler, filed this mandamus action.
 {¶ 34} 26. On February 3, 2007, the SHO mailed a so-called supplemental order stating:
 It is the order of this Staff Hearing Officer that the C-86 Motion, filed 8/30/2006, by the Bureau of Workers' Compensation, is further GRANTED as indicated herein.
 The previous Order neglected to specifically state that Permanent and Total Disability Compensation benefits beginning on the date of hearing 11/1/2006, were to be terminated. The termination is based upon all the evidence and reasoning cited in the original Order. This Staff Hearing Officer specifically notes that termination of Permanent Total Disability Compensation benefits is subject to future application and review.
(Emphasis sic.)
 {¶ 35} 27. On March 8, 2007, the SHO mailed a so-called amended order stating:
 The Supplemental Order, mailed 2/ /2007, must be VACATED. The previous Order, based upon the hearing of 11/1/2006, stands as written.
 The Supplemental Order was without jurisdiction. Unbeknownst to this Staff Hearing Officer, a Writ of Mandamus was filed, on 1/26/2007. The Commission is without jurisdiction to supplement or amend original Orders once a Writ of Mandamus has been filed.
(Emphasis sic.)
Conclusions of Law: *Page 22 {¶ 36} Several issues are presented: (1) whether the Ohio Rules of Evidence ("rules of evidence") precluded the commission's reliance on the evidence upon which it relied; (2) whether the commission's finding that relator demonstrated a capacity for performing sustained remunerative employment is supported by some evidence upon which the commission relied; (3) whether the commission's declaration that the overpayment began May 1, 1996, is supported by some evidence upon which the commission relied; and (4) whether the commission abused its discretion in finding that the compensations were fraudulently obtained.
 {¶ 37} The magistrate finds: (1) the rules of evidence did not preclude the commission's reliance upon the evidence that it relied upon; (2) the commission's finding that relator demonstrated a capacity for performing sustained remunerative employment is supported by some evidence upon which the commission relied; (3) the commission's declaration that the overpayment began May 1, 1996 is supported by some evidence upon which the commission relied; and (4) the commission did not abuse its discretion in finding that the compensations were fraudulently obtained.
 {¶ 38} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained beloe.
 {¶ 39} Turning to the first issue, R.C. 4123.10 provides that the commission "shall not be bound by the usual common law or statutory rules of evidence." R.C. 4123.10 vests the commission with the authority to admit and consider materials of a quasi-evidentiary nature. State exrel. Roberts v. Indus. Comm. (1984), 10 Ohio St.3d 1, 5; State ex rel.Durant v. Superior's Brand Meats, Inc. (1994), 69 Ohio St.3d 284, 293. *Page 23 
 {¶ 40} Moreover, Ohio Adm. Code 4121-3-09(A)(1) provides that "[p]roof may be presented by affidavit, deposition, oral testimony, written statement, document, or other forms of evidence."
 {¶ 41} To reiterate, on October 17, 2005, relator was interviewed by SIU agents who traveled to the Bait Bucket for that purpose. As noted above, the SIU report contains a written summary of relator's statements. Also, attachment nine to the SIU report is a so-called "memorandum" of the interview. The memorandum is signed by special agents Mitchey and Fox. The SIU report's version of the interview is taken from the memorandum signed by special agents Mitchey and Fox.
 {¶ 42} Evid.R. 801 is captioned "Definitions." Evid.R. 801(D) is captioned "Statements which are not hearsay." Evid.R. 801(D)(2) provides that a statement is not hearsay if: "Admission by party-opponent. The statement is offered against a party and is (a) his own statement, in either his individual or a representative capacity, or (b) a statement of which he has manifested his adoption or belief in its truth." (Emphasis sic.)
 {¶ 43} Citing Evid.R. 801(D)(2), relator claims that the memorandum of his October 17, 2005 interview was inadmissible against him at the hearing. Relator argues that the memorandum was not admissible under any exception to the hearsay rule because relator was not the author of the memorandum. Relator's argument lacks merit.
 {¶ 44} To begin, under Evid.R. 801(D)(2)(a), relator's statements to the SIU agents on October 17, 2005 are non-hearsay. See State v.Byrd (1987), 32 Ohio St.3d 79, 88-89. That relator did not author the statements or that he did not adopt the memorandum by, for example, signing it, does not render the statements hearsay. Clearly, under Evid.R. 801(D)(2)(a), relator's statements to the SIU agents as reported in the *Page 24 
memorandum attached to the SIU report are admissions by a party-opponent and are clearly admissible as non-hearsay under the rules of evidence.
 {¶ 45} Moreover, the admissibility of relator's statements to the SIU agents does not turn upon the question of whether the statements are determined to be non-hearsay. Again, R.C. 4123.10 permits the commission to consider and rely upon hearsay regardless of the rules of evidence.
 {¶ 46} The SHO's order of November 1, 2006 indicates reliance upon the statements from Janel Bodi, Janet Beilstein, Jeff Goehring and Dave Ray.
 {¶ 47} Following Janel Bodi's interview on March 13, 2006, a written memorandum of the interview was prepared and signed by special agent Mitchey and fraud analyst Stein. The SIU report's summary of Janel Bodi's interview was taken from the memorandum. Also, Janel Bodi signed a written statement on March 13, 2006.
 {¶ 48} Following her interview by SIU agents on January 18, 2006, Janet Beilstein signed a statement summarizing her interview. As noted earlier, the SIU report presents a summary of that interview that corresponds to Beilstein's signed statement.
 {¶ 49} Following his interview by SIU agents on October 6, 2005, Jeff Goehring signed a statement summarizing his interview. As noted earlier, the SIU report presents a summary of that interview that corresponds to Goehring's signed statement.
 {¶ 50} Following his interview by SIU agents on October 18, 2005, Dave Ray did not provide a signed statement. However, the SIU report presents a summary of the interview.
 {¶ 51} Relator correctly asserts that the statements of Janel Bodi, Janet Beilstein, Jeff Goehring and Dave Ray are hearsay evidence under the rules of evidence. *Page 25 
However, that the statements are hearsay does not detract from their evidentiary value in proceedings before the commission.
 {¶ 52} Other than pointing out that the statements are hearsay, unsworn, and in some cases unsigned, relator presents no other challenge to the reliability of those statements. The magistrate notes that the written statements were prepared at or near the time that they were made. This is an indicia of reliability. Clearly, R.C. 4123.10, as supplemented by Ohio Adm. Code 4121-3-09(A)(1), permits reliance upon written statements — even those that are hearsay, unsworn and unsigned.State ex rel. Collins v. Indus. Comm., Franklin App. No. 04AP-31,2004-Ohio-7201, at ¶ 67-74.
 {¶ 53} Turning to the second issue, in State ex rel. Lawson v. MondieForge, 104 Ohio St.3d 39, 2004-Ohio-6086, at ¶ 15, the court had occasion to address the question: "How active can a person be and still be deemed eligible for PTD?" The Lawson court states:
 PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167, 31 OBR 369, 509 N.E.2d 946. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment. State ex rel. Kirby v. Indus. Comm., 97 Ohio St.3d 427, 2002-Ohio-6668, 780 N.E.2d 275; (2) the physical ability to do sustained remunerative employment, State ex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316, 770 N.E.2d 576; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. See State ex rel. Timmerman Truss, Inc. v. Indus. Comm., 102 Ohio St.3d 244, 2004-Ohio-2589, 809 N.E.2d 15, ¶ 26.
Id. at ¶ 16. (Emphasis sic.)
 {¶ 54} Here, the commission, through its SHO, determined that PTD was inappropriate based upon Lawson's second prong which cites State ex rel.Schultz v. *Page 26 Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316. That is, the commission determined that PTD was inappropriate because it was found that relator has demonstrated the physical ability or capacity to do sustained remunerative employment. The magistrate notes that the bureau's August 30, 2006 motion, citing Schultz, claimed that its investigation disclosed a capacity for sustained remunerative employment. The commission agreed with the bureau's position. It should be noted that, under Lawson's second prong, remuneration for the activities alleged to demonstrate a capacity for sustained remunerative employment need not be proven. In this case, there was no finding by the commission that relator received any remuneration for his activities in connection with the Bait Bucket. Thus, actual remuneration is not at issue in this case.
 {¶ 55} In Schultz, the claimant, Elizabeth B. Schultz, was awarded PTD for her industrial injury. Later, a bureau investigation disclosed Schultz's involvement with her daughter's swim shop where swim wear and aquatic equipment were sold. Statements that Schultz made to bureau investigators and to an insurance adjuster disclosed that she was engaged in "an ongoing pattern of assistance" at the swim shop that could be viewed as sustained activity which was remunerative in nature, even though there was no evidence that Schultz was paid for her efforts. Id. at ¶ 56. The Schultz court held that the commission did not abuse its discretion in terminating PTD compensation.
 {¶ 56} In State ex rel. Ackerman v. Indus. Comm., 99 Ohio St.3d 26,2003-Ohio-2448, the court upheld the commission's determination that Delbert Ackerman had engaged in or was capable of engaging in sustained remunerative employment while receiving PTD compensation. Ackerman owned multiple various business enterprises. The Ackerman court states: "Sedentary activities can constitute sustained remunerative *Page 27 
employment as well, including those administrative and executive decisions necessary to the management of a business." Id. at ¶ 39.
 {¶ 57} Here, the commission, in its order, appropriately citedSchultz and Ackerman for support of its finding that relator has demonstrated the ability or capacity for sustained remunerative employment. The capacity for sustained remunerative employment was demonstrated, as the commission found, by relator "actively participating in the management and work duties required by a bait store." The commission found that relator was "dealing with vendors, handling mail, handling banking activities, as well as various sales related activities." The evidence of record overwhelmingly supports such finding.
 {¶ 58} Here, relator concedes that his activities at the Bait Bucket included "packaging fish; ordering live bait; watching delivery men as they load tanks with live bait; completing paper work; and cleaning fish." (Relator's brief at 10.) However, citing Lawson, relator claims that these activities cannot show a capacity for sustained remunerative employment because they were "routine." (Relator's brief at 11.) Clearly, Lawson does not eliminate activity as evidence of a capacity for sustained remunerative employment simply because such activity can be deemed routine.
 {¶ 59} Relator also claims that he often slept at the Bait Bucket and thus he cannot be found to have a capacity for sustained remunerative employment. This argument lacks merit. While relator himself has claimed that he slept for several hours a day while at the Bait Bucket, it is the commission that weighs the evidence. The commission could determine, based upon the surveillance evidence and statements from various witnesses, *Page 28 
that any sleeping at the Bait Bucket did not significantly detract from the sustained remunerable nature of relator's activities.
 {¶ 60} The third issue, as previously noted, is whether the commission's declaration that the overpayment began May 1, 1996, is supported by some evidence upon which the commission relied.
 {¶ 61} The SHO's order selects May 1, 1996 as the date on which it was necessarily found that relator first began activities demonstrating a capacity for sustained remunerative employment.
 {¶ 62} There was evidence that the Bait Bucket's business is seasonal. On July 18, 1998, relator's spouse, Janet Kugler, applied to the Ohio Department of Natural Resources ("ODNR"), Division of Wildlife, for appointment of issuing agent for licenses and permits. On the application, Janet Kugler indicated that the business is a sole proprietorship and that she is the owner. The store hours are listed as Sunday through Saturday, 6 a.m. to 8:30 p.m. from May 1 through November 15.
 {¶ 63} On August 23, 2005, during an SIU surveillance, relator informed fraud analyst Owens that the Bait Bucket was open "from mid May through November," according to the SIU report.
 {¶ 64} There is clearly some evidence upon which the commission can rely that the Bait Bucket's business was seasonal and that the season typically ran from May 1 through November 15. That is not actually in dispute here.
 {¶ 65} What is in dispute here is whether there is some evidence to support the SHO's finding that relator began demonstrating a capacity for sustained remunerative employment as early as 1996. The SHO never explained why 1996 was selected as the *Page 29 
year for the start date for the overpayment. However, the only evidence in the record upon which the SHO could have relied to support May 1, 1996 as the start date is found in the evidence relating to SIU's October 6, 2005 interview of Jeff "AJ" Goehring, who owns A-n-J Bait in Port Clinton.
 {¶ 66} On October 6, 2005, Goehring signed a written statement prepared by SIU on an SIU form. Goehring's signed statement states in its entirety:
 I am the sole owner of A-n-J Bait and we have provided bait to Freddie Kugler dba The Bait Bucket since at least 1996. During that time, I have dealt with primarily Freddie Kugler and he typically orders one or two gallons (8-16 pounds) of minnows per week. The only other person that handled the delivery was Freddie Kugler's wife, Janet, when she was alive. Since Janet passed, Freddie is always present when deliveries are made and pays cash for the bait. I usually make the deliveries to the Bait Bucket. Either Freddie contacts me when he needs a delivery or I will call Freddie if we're going to be in the area. I will check my records, but typically do not keep invoices if the customer pays cash.
 {¶ 67} As previously noted, Goehring's interview is reported in the SIU report which states: "AJ indicated that he had been doing business with KUGLER since approximately 1996." (Emphasis sic.)
 {¶ 68} There is an inconsistency between Goehring's signed statement and the SIU report of Goehring's interview. In his signed statement, Goehring states that A-n-J Bait has been providing bait to Kugler "since at least 1996." The SIU report states that Goehring indicated that he had been doing business with Kugler "since approximately 1996."
 {¶ 69} The SIU report's statement that Goehring indicated that he had been doing business with Kugler "since approximately 1996" is not some evidence, standing alone, that relator began demonstrating a capacity for sustained remunerative employment *Page 30 
during 1996. Use of the word "approximately" indicates that the person giving the statement is uncertain of the year.
 {¶ 70} On the other hand, Goehring's statement that he had been providing bait to Kugler "since at least 1996" indicates certainty as to the year 1996, but uncertainty as to the years prior to 1996.
 {¶ 71} At the November 1, 2006 hearing before the SHO, SIU special agent Mitchey testified as follows under direct examination:
 We interviewed Mr. Ghering [sic]. He was the owner of A J Bait and he advised us that he had been a vendor for — I'm sorry, for the Bait Bucket since at least `96 and that he had dealt primarily with Mr. Kugler when he would deliver the bait for the bait shop and —
(Tr. 5-6.)
 {¶ 72} Thus, special agent Mitchey's hearing testimony indicates Goehring's certainty as to the year 1996.
 {¶ 73} In the view of the magistrate, special agent Mitchey's hearing testimony, as supported by Goehring's signed statement, is some evidence upon which the SHO could rely to support a finding that, as of May 1, 1996, relator demonstrated a capacity for sustained remunerative employment. Goehring's statement indicates that, as early as the 1996 season, relator dealt with a vendor of the Bait Bucket. It can easily be inferred that ordering bait from the vendor and paying cash for the delivered order is an activity exercised by one who is acting as a manager of the bait store.
 {¶ 74} The commission, like any other fact finder in any administrative, civil or criminal proceeding, may draw reasonable inferences and rely upon his or her own *Page 31 
common sense in evaluating evidence. State ex rel. Supreme Bumpers, Inc.v. Indus. Comm., 98 Ohio St.3d 134, 2002-Ohio-7089, at ¶ 69.
 {¶ 75} The SIU surveillance during the latter part of 2005 disclosed relator exhibiting a capacity for sustained remunerative employment in managing the Bait Bucket, during that time. Even though the surveillance occurred in 2005, the commission could draw reasonable inferences from the evidence that relator had been managing the Bait Bucket for many years prior to the SIU surveillance. In addition to Goehring's statement, the commission also had Janel Bodi's statement that her mother, Janet Kugler, had purchased the Bait Bucket "around 1990," and that relator and Janet took over operating the Bait Bucket at that time.
 {¶ 76} Notwithstanding Janel Bodi's statement that "around 1990" relator and his wife "took over operating the Bait Bucket," the SHO decided that May 1, 1996 was the appropriate date to begin the overpayment, apparently because of Goehring's statement to SIU that he had provided bait to Kugler at the Bait Bucket "since at least 1996."
 {¶ 77} In short, the commission's declaration of an overpayment beginning May 1, 1996 is supported by some evidence and does not constitute an abuse of discretion.
 {¶ 78} Turning to the fourth issue, the elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. Gaines v.Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, 55. *Page 32 
 {¶ 79} During the November 1, 2006 hearing, relator testified as follows under direct examination by his counsel:
 Q. Did you ever receive any pay —
 A. No.
 Q. — for the activities that you performed?
 A. No.
 Q. Did you believe that you were working at the time?
 A. No, because I didn't get any money, that's why I didn't think I was working.
(Tr. 86.)
 {¶ 80} According to relator, given that the commission did not determine that he had received remuneration for his activities at the Bait Bucket, it cannot be found that he knowingly made false statements to the bureau on the so-called PTD contact letters. According to relator, if he was not being paid for his activities, he should not be required to tell the bureau that he was working.
 {¶ 81} The commission, through its SHO, addressed this issue in its order:
 The third element of the fraud case requires a showing of a knowledge of the falsities of the representations or an utter disregard or recklessness concerning the statements. After a review of all of the evidence in this case, this Staff Hearing Officer is unable, under any circumstances, to conclude that the injured worker's activity at the Bait Bucket constituted a hobby as suggested by injured worker's representations.
 Indeed, the evidence suggests] a pattern of activity consistent with work activities. The evidence shows the injured worker dealing with vendors, handling mail, handling banking activities, as well as various sales related activities. Indeed, even injured worker's testimony at hearing betrays his innocence in this matter. The injured worker testified that, "I knew I could not have anything in my name." *Page 33 
 {¶ 82} Significantly, the PTD contact letters sent to relator did not define the word "work," nor did they indicate that the "work" must be remunerated.
 {¶ 83} Relator's activities at the Bait Bucket during the surveillance were significant. Moreover, as the SHO's order finds, there is "clear evidence of concealment of the injured worker's role in this business." Under these circumstances, the SHO was not compelled to credit relator's hearing testimony that he did not believe he was working.
 {¶ 84} In short, relator has not shown that the commission abused its discretion in finding that the compensations were fraudulently obtained.
 {¶ 85} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1